WESTLAW

2012-1196

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

ASHLEY FURNITURE INDUSTRIES, INC.,
Plaintiff-Appellant,
v.
UNITED STATES
Defendant-Appellee,
and
UNITED STATES INTERNATIONAL TRADE COMMISSION,
Defendant-Appellee,
and
AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL
TRADE, KINCAID FURNITURE CO., INC., L. & J.G. STICKLEY, INC.,
SANDBERG FURNITURE MANUFACTURING COMPANY, INC.,
STANLEY FURNITURE COMPANY, INC., T. COPELAND AND SONS, INC.,
and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,
Defendants-Appellees.

---

Appeal from the United States Court of International Trade in
consolidated case no. 07-CV-00323, Judge Timothy C. Stanceu.

---

## BRIEF OF PLAINTIFF-APPELLANT
## ASHLEY FURNITURE INDUSTRIES, INC.

*Of Counsel*:
Kevin Russell
GOLDSTEIN & RUSSELL, P.C.
5225 Wisconsin Ave., NW
Ste. 404
Washington, D.C. 20015


April 16, 2012

Kristin H. Mowry
Jeffrey S. Grimson
Jill A. Cramer
Susan Lehman Brooks
Sarah M. Wyss
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015
*Counsel to Ashley Furniture Indus., Inc.*

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

APR 1 6 2012

JAN HORBALY
CLERK

FORM 9. Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ASHLEY FURNITURE INDUSTRIES, INC. v. UNITED STATES

No. 2012-1196

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

appellant Ashley Furniture Indus., Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.  The full name of every party or amicus represented by me is:

Ashley Furniture Industries, Inc.

---

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Ashley Furniture Industries, Inc. is the real party in interest.

---

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

---

4.  ☑ The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Mowry and Grimson, PLLC (Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Susan E. Lehman, Sarah M. Wyss, Jodi Herman, Keith Huffman); Goldstein, Russell & Howe (now Goldstein & Russell, PC) (Kevin Russell)

---

4.16.2012
Date

Signature of counsel

KRISTIN H. MOWRY
Printed name of counsel

Please Note: All questions must be answered
cc: Joseph Dorn, Jessica Toplin, Patrick Gallagher

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED CASES ........................................ 1

JURISDICTIONAL STATEMENT .............................................. 2

STATEMENT OF ISSUES ........................................................... 3

STATEMENT OF THE CASE ....................................................... 4

   I.   Statutory Background ............................................................ 4

   II.   Proceedings Below .............................................................. 8

STATEMENT OF FACTS ............................................................. 10

SUMMARY OF ARGUMENT .................................................... 15

ARGUMENT ............................................................................... 22

   I.   Standard Of Review ........................................................... 22

   II.   This Court's Decision In *SKF* Did Not Resolve The Proper Application Or Constitutionality Of CDSOA's Petition Support Requirement As Applied To Firms Whose Only Opposition To A Petition Is The Expression Of An Opinion On The Desirability Of Antidumping Duties ......................................................................... 22

      A.   The Only Question Presented And Decided In *SKF* Was Whether CDSOA Is Constitutional As Applied To Companies That Actively Oppose An Antidumping Petition. .................. 24

      B.   The Manufacturer's Active Opposition Was Central To The Court's Analysis And Holding In *SKF*. .................................. 28

      C.   Any Statements In *SKF* Regarding The Act's Constitutionality As Applied In Circumstances Not Before The Court Were Dicta. ...................................................................... 31

   II.   The Doctrinal Foundations Of *SKF* Have Been Fatally Undermined By Subsequent Supreme Court Decisions. .................................................... 36

      A.   Intervening Supreme Decisions Make Clear That The CDSOA Is Subject To Strict Scrutiny. .................................................. 37

i

1. Sorrell *and* Arizona Free Enterprise *Recently Held That Strict Scrutiny Applies To Laws That Burden Speech On The Basis Of Content, Even If They Do Not Ban It Completely.* ........................................................ 39

2. *The Court's Decision in* Humanitarian Law Project *Makes Clear That A Suppressive Purpose Is Not Required To Invoke Strict Scrutiny Of A Facially Discriminatory Statute.* ........................................................... 47

3. Citizens United *Makes Clear That Strict Scrutiny Applies Equally To Laws That Burden Speech Relating To "Activities Of A Commercial Nature."* ............................ 48

B. Even If Strict Scrutiny Was Not Required, *Sorrell* Makes Clear That This Court Misapplied The Commercial Speech Test As Applied To A Facially Discriminatory Statute. ........ 53

III. The CIT Erred In Holding That The Free Speech Clause Of The First Amendment Permits Denying Distributions To Ashley Based Solely On Its Expression Of Abstract Opposition To An Antidumping Petition..... 55

IV. The CDSOA's Constitutional Difficulties Can Be Avoided By Construing The Statute To Permit Distributions To Firms Like Ashley That Support A Petition By Providing Practical Assistance Through Answering Government Questionnaires While Taking No Action To Oppose The Petition Other Than The Expression Of Abstract Disagreement With The Imposition Of Duties. ....................................... 61

CONCLUSION ............................................................................. 65

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011) ................................................................................ passim

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) .................... 49

*Ashley Furniture Industries, Inc. v. United States*, No. 07-00323, Slip Op. 12-14 (Jan. 31, 2012)) .......................................................................... passim

*Brown v. Entm't Merchs. Ass'n.*, 131 S. Ct. 2729 (2011) ................................. 56

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................. 51

*Cal. Fed. Bank v. United States*, 395 F.3d 1263 (Fed. Cir. 2005) ..................... 37

*Candle Corp. v. Int'l Trade Comm'n*, 374 F.3d 1087 (Fed. Cir. 2004) ............... 2

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980) ......................................................... 25, 38, 46, 53

*Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010) .. passim

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294  (Fed. Cir. 2004) .................................................................................................... 33

*DaimlerChrysler Corp. v. United States*, 361 F.3d 1378 (Fed. Cir. 2004) ........ 52

*Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004) ....................................... 37

*Easter v. United States*, 575 F.3d 1332 (Fed. Cir. 2009) ................................... 37

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) ................. passim

*Kastigar v. United States*, 406 U.S. 441 (1972) ................................................. 33

*NEA v. Finley*, 524 U.S. 569 (1998) ....................................... 34

*Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006)............................ 52

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) ................... 52

*SKF USA Inc. v. United States*, 30 CIT 1433, 451 F. Supp. 2d 1355 (Ct. Int'l Trade 2006) ........................................................ 24

*SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009)............................................................passim

*Snyder v. Phelps*, 131 S. Ct. 1207 (2011) ..............................passim

*Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011) ...................passim

*United States v. Becton*, 632 F.2d 1294 (5th Cir.1980) .................... 52

*United States v. Stevens*, 130 S. Ct. 1577 (2010)....................... 33, 51

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ........................................................... 23

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ........................................................... 34, 51

*Watson v. Buck*, 313 U.S. 387 (1941) ................................... 33

## FEDERAL STATUTES, AGENCY REGULATIONS AND RULES

19 U.S.C. § 1333 ....................................................... 5, 11

19 U.S.C. § 1673 ......................................................... 4

19 U.S.C. § 1673a .................................................... 5, 6, 61

19 U.S.C. § 1673b ........................................................ 5

19 U.S.C. § 1673d ....................................................................... 5, 7

19 U.S.C. § 1673e ......................................................................... 6

19 U.S.C. §1675c ...................................................................passim

19 U.S.C. § 7601 ........................................................................... 8

28 U.S.C. § 1295 ........................................................................... 3

28 U.S.C. § 1581 ........................................................................... 2

28 U.S.C. § 1821 ......................................................................... 60

28 U.S.C. § 2107 ........................................................................... 3

Agriculture, Rural Development, Food and Drug Administration, and Related
    Agencies Appropriations Act, Pub. L. No. 106-387, §§ 1001-03, 114 Stat.
    1549, 1549A-72-75 (2000)........................................................... 6

Continued Dumping and Subsidy Offset Act of 2000, 19 U.S.C. § 1675c(a)
    (2000) ...........................................................................passim

Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601(a), 120 Stat. 4, 154
    ...................................................................................... 8

Fed. R. App. P. 4(a).......................................................................... 3

## ADMINISTRATIVE DETERMINATIONS

World Trade Organization Appellate Body Report, *United States – Continued
    Dumping and Subsidy Offset Act of 2000*, ¶¶ 318-19 WT/DS217/AB/R,
    WT/DS234/AB/R (Jan. 16, 2003)................................................... 7

Int'l Trade Comm'n, Wooden Bedroom Furniture from China, No. 731-TA-
    1058 (Final), USITC Pub. 3743 (Dec. 2004)............................. 13, 53

Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture From the People's Republic of China, 70 Fed. Reg. 329 (Jan. 4, 2005).......................................14

Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Wooden Bedroom Furniture From the People's Republic of China, 69 Fed. Reg. 35,312 (June 23, 2004)...............11

## DOCKETED CASES

*Barden Corp. v. United States*, No. 06-00435 .....................................................1

*Ethan Allen Global v. United States*, No. 2012-1200 ..........................................1

*Furniture Brands International, Inc. v. United States*, No. 2012-1059...............1

*Giorgio Foods Inc. v. United States*, No. 03-00286 ...........................................1

*Nan Ya Plastics Corp., Am. v. United States*, No. 08-00138 ...............................2

*New Hampshire Ball Bearings v. United States*, No. 2012-1246 .........................1

*Pat Huval Restaurant v. International Trade Commission*, No. 2012-1250 .......1

*PS Chez Sidney v. United States*, No. 2008-1005 ................................................1

*Schaeffler Group USA Inc. v. United States*, No. 2012-1269 ..............................1

*Standard Furniture Manufacturing Co., Inc. v. United States*, No. 2012-1230..1

*United Synthetics, Inc. v. United States*, No. 08-00139 .......................................2

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action was previously before the U.S. Court of Appeals for the Federal Circuit or any other appellate court.

Counsel for Plaintiff-Appellant Ashley Furniture Industries, Inc. ("Ashley") is aware of two other cases filed before Ashley's appeal that are pending in this or any other court that may directly affect this Court's decision on appeal: *Furniture Brands International, Inc. v. United States*, No. 2012-1059; *PS Chez Sidney v. United States*, No. 2008-1005.

Counsel for Ashley is aware of five other cases pending in this Court on the issue of the legality of the Continued Dumping and Subsidy Offset Act of 2000, Pub. L. No. 106-387, § 1003(a), 114 Stat. 1549 (2000) ("CDSOA"): *Ethan Allen Global v. United States*, No. 2012-1200; *Standard Furniture Manufacturing Co., Inc. v. United States*, No. 2012-1230; *New Hampshire Ball Bearings v. United States*, No. 2012-1246; *Pat Huval Restaurant v. International Trade Commission*, No. 2012-1250; *Schaeffler Group USA Inc. v. United States*, No. 2012-1269. In addition, counsel for Ashley is aware that the legality of the CDSOA is an issue in four cases pending before the Court of International Trade ("CIT"): *Giorgio Foods Inc. v. United States*, No. 03-00286; *Barden Corp. v. United States*, No. 06-00435 (consol.); *Nan Ya Plastics*

*Corp., Am. v. United States*, No. 08-00138; and *United Synthetics, Inc. v. United States*, No. 08-00139.

## JURISDICTIONAL STATEMENT

This action is an appeal from the final judgment of the CIT in *Ashley Furniture Industries, Inc. v. United States*, No. 07-00323, Slip Op. 12-14 (Jan. 31, 2012) (JA000001).[1]  The CIT had jurisdiction pursuant to 28 U.S.C. § 1581(i).  That provision gives the Court of International Trade exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for – . . . (2) tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue . . . [or] (4) administration and enforcement with respect to matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section." 28 U.S.C. § 1581(i); *see also Candle Corp. v. Int'l Trade Comm'n*, 374 F.3d 1087, 1091 (Fed. Cir. 2004).  The Court of Appeals for the Federal Circuit has

---

[1]    Citations to the joint appendix are in the format "JA" followed by the specific number shown on the bottom of the relevant page of the record, *i.e.*, the first page of the Required Section of the Joint Appendix is stamped JA000001 and the citation to that page would be "JA000001."

2

jurisdiction to review decisions of the CIT pursuant to 28 U.S.C. § 1295(a)(5). This appeal is from a final judgment that disposes of all parties' claims.

Ashley's appeal was timely filed pursuant to 28 U.S.C. § 2107(b) and Fed. R. App. P. 4(a)(1)(B) because the CIT entered judgment on January 31, 2012 and Ashley filed its notice if appeal the next day on February 1, 2012, within 60 days of the CIT's final judgment.

## STATEMENT OF ISSUES

1.    Whether this Court's decision in *SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009), resolved the application and constitutionality of the petition support requirement of the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA"), 19 U.S.C. § 1675c(a) (2000) (repealed 2006), as applied to firms that provided practical support to the government's antidumping investigation and expressed only abstract opposition to the imposition of duties.

2.    Whether the CDSOA violates the Free Speech Clause of the First Amendment, if construed to deny distributions of the proceeds of antidumping duties to firms that provided practical support to the government's antidumping investigation and expressed only abstract opposition to the imposition of duties.

3

3.    Whether, to avoid significant questions regarding CDSOA's constitutionality, the statute should be construed to allow distributions of the proceeds of antidumping duties to all firms that provided practical support to the government's antidumping investigation by answering government questionnaires, so long as the firm took no step to interfere with or oppose imposition of the duties beyond expressing abstract opposition to the petition in response to a direct question on the government questionnaire.

## STATEMENT OF THE CASE

This is an appeal from the order of the Court of International Trade holding that the First Amendment permits the government to deny distributions of antidumping duties to injured U.S. businesses solely because those businesses did not publicly express support for the antidumping petition.

## I.    Statutory Background

The Tariff Act of 1930, as amended, purports to protect U.S. markets from foreign interference by authorizing antidumping duties against foreign businesses and countries that export artificially low-priced goods to the United States. *See* 19 U.S.C. §§ 1673 *et seq.* Before imposing antidumping duties, the Department of Commerce ("Commerce") conducts an investigation to determine whether dumping has occurred. *See id.* §§ 1673a, 1673b(b),

4

1673d(a). The International Trade Commission ("ITC") conducts a parallel investigation to determine whether the domestic industry has been materially injured, or is likely to be materially injured, by the dumping. *Id.* §§ 1673b(a), 1673d(b). While Commerce has the ability to initiate such investigations itself, it more commonly does so at the behest of domestic businesses that file a petition requesting an investigation. *See id.* § 1673a(b).

Once an investigation is initiated, domestic and foreign producers, importers, and purchasers of the relevant commodities receive questionnaires from the ITC, which ask for detailed business and market information, and also ask whether the domestic producers support the petition. *See, e.g.*, U.S. Int'l Trade Comm'n, No. 731-TA-1058, Producers' Questionnaire (Final), Wooden Bedroom from China (2004) (JA000169 – JA000206). Responses to the questionnaire are required by law. 19 U.S.C. § 1333. The ITC conducts both a preliminary and final phase of the investigation, issuing separate questionnaires during each phase. For a petition to succeed, at least 25% of the entire domestic industry – and at least 50% of that portion of the domestic industry that expresses a view on the petition – must support it. 19 U.S.C. § 1673a(c)(4)(A).

If the petition obtains the necessary support, and if Commerce determines that dumping has occurred and the ITC determines that the domestic industry

5

has been injured or threatened with material injury, Commerce issues an antidumping order and directs U.S. Customs and Border Protection ("Customs") to levy duties on the relevant goods. 19 U.S.C. § 1673e. In antidumping cases, the duty equals the percentage by which the export price exceeds normal value. *See id.* § 1673.

Originally, the duties collected were placed in the U.S. Treasury's general revenue fund. But in 2000, Congress enacted the CDSOA as a last-minute amendment to the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, Pub. L. No. 106-387, §§ 1001-03, 114 Stat. 1549, 1549A-72-75 (2000). Also known as the "Byrd Amendment" because it was proposed by Senator Robert Byrd of West Virginia, the CDSOA required that all antidumping and countervailing duties be distributed to the affected industry. 19 U.S.C. § 1675c(a) (2000). The CDSOA provides funds to individual businesses that qualify as "affected domestic producers." *Id.* Domestic producers that qualify receive duties commensurate with their "qualifying expenditures," which are certain enumerated expenses recorded after the antidumping order is entered. *Id.* § 1675c(b)(4) (2000).

At the core of this case is a limitation on such distributions – to qualify as an affected domestic producer, a business must have either filed the petition or

6

publicly supported it, either "by letter or through questionnaire response." 19 U.S.C. §§ 1675c(b)(1), (d)(1) (2000). As a consequence, identically situated domestic producers are denied or given a portion of collected antidumping duties based solely on differences in their speech on a politically controversial question of trade policy.

The CDSOA has always been controversial.[2] Months after it was enacted, eight of the United States' trading partners sought consultations in the World Trade Organization on whether the CDSOA violated the United States' international obligations. A WTO panel held that it did, and the WTO Appellate Body upheld that determination in relevant part in January of 2003. *See* Appellate Body Report, *United States – Continued Dumping and Subsidy Offset Act of 2000*, ¶¶ 318-19 WT/DS217/AB/R, WT/DS234/AB/R (Jan. 16, 2003). On November 26, 2004, the WTO authorized the complainants to

---

[2] *See* Tudor N. Rus, *Recent Development: The Short, Unhappy Life of the Byrd Amendment*, 10 N.Y.U. J. Legis. & Pub. Pol'y 427, 427-48 nn.3-7, 437 nn.78-82 (2007) (describing domestic political debates about the CDSOA regime); *see also* Daniel Ikenson, *Byrd Boondoggle*, National Review Online (Dec. 9, 2005), http://www.nationalreview.com/articles/216206/byrd-boondoggle/daniel-ikenson; Daniella Markheim, *Time to Repeal the Byrd Amendment*, The Heritage Foundation (Oct. 30, 2005), http://www.heritage.org/research/reports/2005/10/time-to-repeal-the-byrd-amendment.

retaliate against the United States by imposing additional tariffs on U.S. exports.    *See* WTO, Dispute Settlement: Dispute DS217, http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds217_e.htm.

Congress repealed the CDSOA shortly thereafter in the Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601(a), 120 Stat. 4, 154. However, Congress provided for the continued distribution of "duties on entries of goods made and filed before October 1, 2007." *Id.* § 7601(b). Thus, the duties at issue in this case, which accrued on importations made prior to October 1, 2007, remain subject to the CDSOA's requirements.

## II.    Proceedings Below

In 2007, Ashley filed this suit, challenging its denial of a share of antidumping duties collected as a result of a successful petition to impose duties on imported Chinese wooden bedroom furniture in fiscal year 2007.[3] Among other things, Ashley's amended complaint alleged that Ashley was entitled to a share of the proceeds under the terms of the statute, properly construed, and that if construed to deny it a distribution based on its expression abstract opposition

---

[3] Ashley filed subsequent lawsuits, later consolidated into No. 07-00323, challenging denials of CDSOA funds in FY2008, FY2009 and FY2010 as well. The complaints are identical except in regards to the unique facts of each fiscal year.

to the underlying petition, the statute violated the First Amendment. First Amended Compl. ¶¶ 39-50, No. 07-00323 (JA000079 – JA000080). The original petitioners and other companies that had been given distributions intervened in the case as defendant-intervenors.

The case was stayed pending this Court's decision in *SKF USA, Inc. v. United States Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009), in which an American subsidiary for a foreign exporter subject to antidumping duties challenged the constitutionality of the petition support requirement. After this Court rejected SKF's constitutional challenge, the CIT issued a show cause order directing parties to show cause why their case should not be dismissed under Rule 12(b)(5) in light of that decision. Show Cause Order, Jan. 3, 2011, No. 07-00323 (JA000131 – JA000134). The CIT did not ultimately dismiss Ashley's case in response to the Show Cause Order, but shortly thereafter, the government and defendant-intervenors moved to dismiss, arguing that this Court's decision in *SKF* resolved all of Ashley's claims. *Ashley*, Slip Op. 12-14 at 4 (JA000004). Ashley opposed the motion, arguing *SKF* was distinguishable, and that subsequent decisions of the Supreme Court had critically undermined *SKF*'s doctrinal foundations. *Id.* at 14 (JA000014). On January 31, 2012, the CIT granted defendants' motion to dismiss all of Ashley's

claims, concluding, as relevant here, that "*SKF* remains binding precedent that is controlling on the disposition of plaintiff's" claims. *See id.* at 25 (JA000025). Simultaneously, the CIT rejected Ashley's request for a preliminary injunction barring the government from distributing its share of the CDSOA proceedings during the pendency of this action. *Id.* at 10-12 (JA000010 – JA000012).

Ashley subsequently moved in this Court for an injunction pending appeal to prevent the government from distributing the funds at issue in the case until the appeal is resolved. The government and intervenors, in turn, moved for summary affirmance. On March 5, 2012, this Court denied Ashley's motion for an injunction pending appeal. On March 23, this Court denied appellees' motion for summary affirmance.

The CIT has rejected similar claims in several other cases that are now on appeal to this Court, while other challenges to the constitutionality of CDSOA's petition support requirement remain pending in the CIT. *See* Statement of Related Cases, *supra.*

## STATEMENT OF FACTS

Ashley is a U.S. furniture manufacturer. Established in 1945 and headquartered in Arcadia, Wisconsin, Ashley produces and sells a broad line of

quality furniture to a worldwide customer base. The company employs over 12,000 people in the United States and produces, among other things, wooden bedroom furniture.

On December 17, 2003, in response to a petition filed by Defendant-Appellee American Furniture Manufacturers Committee for Legal Trade, Commerce initiated an antidumping investigation against Chinese wooden bedroom furniture manufacturers. Approximately six months later, Commerce issued its preliminary determination that the Chinese companies were selling wooden bedroom furniture in the United States at less than its fair value, and were thereby engaging in dumping. Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Wooden Bedroom Furniture From the People's Republic of China, 69 Fed. Reg. 35,312, (June 23, 2004).

In parallel with Commerce's inquiry, the ITC investigated whether the domestic industry had been materially injured by reason of dumped imports from China. The ITC distributed questionnaires to all known domestic and foreign producers, importers, and purchasers of wooden bedroom furniture. As with all antidumping questionnaires, recipients were required by law to respond. *See* 19 U.S.C. § 1333.

Ashley received two domestic producer questionnaires – a preliminary questionnaire in 2003, and a final questionnaire in 2004. The questionnaires were 34 and 38 pages each, and required Ashley to compile four years of business data regarding its production, purchases, shipments, and sales. The questionnaires also made qualitative inquiries into a range of subjects, including: Ashley's ownership structure; its relationship to foreign businesses; its production capacity; its relationship with its customers as a result of the petition; its pricing strategies; and its understanding of supply and demand factors influencing the market for wooden bedroom furniture. *See generally* U.S. Int'l Trade Comm'n, No. 731-TA-1058, Producers' Questionnaire (Prelim.), Wooden Bedroom from China (2003) (JA000135 - JA000168); Producers' Questionnaire (final) (JA000169 – JA000206). Ashley responded fully and honestly to both questionnaires, at a total cost of approximately $15,000 and 160 hours of employee time. Ashley Furniture Indus., Inc. Producers' Questionnaire (Prelim.) at 2 (JA000208); Ashley Furniture Indus., Inc. Producers' Questionnaire (Final) at 2 (JA000210). The ITC combined Ashley's data along with that of other domestic producers (both petitioners and non-petitioners) when assessing the overall condition of the domestic industry.

Int'l Trade Comm'n, Wooden Bedroom Furniture from China, No. 731-TA-1058 (Final), USITC Pub. 3743, at 13 (Dec. 2004) (JA000211 - JA000429).

The questionnaires also required Ashley to take a position on the petition. Question I-3 asked "Do you support or oppose the petition?" and provides three options: Support; Oppose; or Take no position.    Producers' Questionnaire (Prelim.) at 2 (JA000136); Producers' Questionnaire (Final) at 2 (JA000170). Ashley marked "Oppose," without additional explanation.   Ashley Furniture Indus., Inc. Producers' Questionnaire (Prelim.) at 2 (JA000208); Ashley Furniture Indus., Inc. Producers' Questionnaire (Final) at 2 (JA000210).

The ITC subsequently held a series of hearings on the petition.  Ashley did not take any part in the hearings – it made no appearance, presented no evidence, offered no testimony, and made no argument against the petition.    In this respect,  Ashley's participation in the investigation was indistinguishable from that of many other companies that subsequently received CDSOA distributions except for the fact that Ashley expressed abstract opposition to the imposition of duties whereas others expressed abstract support for duties.[4]

_____

[4] As alleged in Ashley's amended complaints, based on a search of the ITC's public electronic docket, during the ITC's investigation, it appears that four U.S. manufacturers of WBF (Perdues, Bebe, Oakwood Interiors and Tom

In 2005, Commerce and the ITC issued an antidumping duty order following final determinations of dumping and injury to the domestic industry. *See* Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture From the People's Republic of China, 70 Fed. Reg. 329, 329-30 (Jan. 4, 2005). The Department of Commerce therefore directed Customs to collect duties on entries of Chinese wooden bedroom furniture.

The following year, when it came time for the government's annual CDSOA distributions, the ITC prepared a list of affected domestic producers based on the questionnaire responses and other letters of support received during the original investigation. Customs then determined the amount of distributions by seeking certifications from domestic producers that wished to receive a share of the duties as to their qualifying expenditures. Ashley timely submitted such certifications each year from 2007 to 2010, but was repeatedly informed that the ITC and CBP regarded it as ineligible to receive distributions because it had not supported the petition. *See* First Amended Compl. ¶¶ 32-36,

---

Seely Furniture) who were not petitioners took the same action as Ashley, *i.e.*, answered the questionnaire, but did not otherwise provide additional argument during the ITC's investigations. First Amended Compl. ¶ 21, No. 07-00323.

No. 07-00323 (JA000077 – JA000078); First Amended Compl. ¶¶ 33-37, No.

09-00025 (JA000098 – JA000099); First Amended Compl. ¶¶ 30-34, No. 10-

00081 (JA000116 – JA000117).[5]  This suit followed.

## SUMMARY OF ARGUMENT

Appellant Ashley competes with numerous other domestic furniture

manufacturers – including, for example, Oakwood Interiors.  Neither Oakwood

nor Ashley initiated the antidumping proceedings at issue in this case, but both

answered extensive questionnaires from the government and thus provided

significant practical support to the investigation.  That was the extent of both

companies' participation in the antidumping proceedings.  Neither company

filed briefs, provided witnesses, appeared at hearings, or otherwise actively

supported or opposed the petition.  Yet when the investigation was completed,

Oakwood received a portion of the resulting antidumping duties while Ashley

was denied any distribution.  The only reason for this difference in treatment

was because when asked, Oakwood expressed support for the imposition of the

duties while Ashley stated that it opposed them.

---

[5] Customs nevertheless withheld funds for Ashley on the basis that its
eligibility to receive funds may be determined by the outcome of pending
litigation.

Typically, such viewpoint discrimination on a question of undeniable public concern and political controversy is subject to, and fails, strict scrutiny. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011) ("In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory."). The CIT nonetheless concluded that it was compelled by this Court's decision in *SKF USA v. United States. Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009), to uphold the statute as applied to Ashley. That conclusion was wrong.

**I.** First of all, *SKF* is distinguishable. This Court in *SKF* gave the CDSOA a saving construction to ensure that it would distinguish between companies on the basis of their litigation conduct, not their speech. Accordingly, the Court held that the statute could constitutionally restrict distributions to companies that provided practical support for the government investigation by filing the petition or answering the ITC's questionnaires. Relying on an analogy to civil litigation, the Court reasoned that the companies that received distributions were like prevailing plaintiffs or qui tam relators. SKF, on the other hand, had acted as the equivalent of a defendant, actively opposing the petition not only by speech, but through litigation conduct, including by presenting evidence and testimony at the hearing and appearing

16

through counsel to resist imposition of duties against its parent company. Given the long and unquestioned history of providing attorney's fees and qui tam awards to prevailing plaintiffs, while denying them to defendants, the Court held that Congress could constitutionally deny SKF a share of the antidumping duties it actively opposed.

This case presents a very different constitutional question because Ashley is nothing like a defendant; it is, instead, the equivalent of a witness. Unlike SKF, Ashley took no steps to actively oppose the petition – it sent no lawyers to the hearings, filed no briefs in opposition to the petition, presented no witnesses, and submitted no evidence. That difference is material because there is no constitutional tradition of denying witness fees to witnesses based on which side of the litigation they support. And there is simply no way to explain the different treatment of Ashley and Oakwood Interiors as grounded in differences in their level of litigation assistance rather than their speech.

Accordingly, this Court had no occasion in *SKF* to decide the constitutionality of the CDSOA as applied to witness equivalents. And as a result, any statements it made that could be read as expressing a view on that very different question are non-binding dicta. No court is empowered to declare a statute constitutional in all its applications, and for good reason.

17

Because the distinction between witnesses and defendants would not have helped SKF, it had no incentive to brief that issue, and did not do so. Any ruminations on the statute's constitutionality in circumstances not before the Court therefore were unmoored from the basic legal procedures designed to ensure the reliability and promote the legitimacy of judicial decisionmaking.

**II.** In any event, *SKF*'s foundational assumptions have been vitiated by subsequent Supreme Court decisions that make clear that the CDSOA's viewpoint discrimination is subject to strict scrutiny and would fail even intermediate scrutiny under the commercial speech doctrine.

**A.** The *SKF* panel concluded that the intermediate scrutiny of the commercial speech doctrine applied in that case, for three reasons, each of which has subsequently been rejected by the Supreme Court as a basis for denying strict scrutiny to statutes that facially discriminate on the basis of speech.

First, this Court found constitutionally significant that the CDSOA does not ban speech, but instead simply imposes a financial cost (in the form of foregone distributions) on those who express opposition to the imposition of antidumping duties. But in the subsequent decision of *Sorrell v. IMS Health Inc.*, the Supreme Court rejected that reason, explaining that "the distinction

18

between laws burdening and laws banning speech is but a matter of degree and that the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." 131 S. Ct. at 2664 (internal quotation marks omitted). Consistent with that teaching, a few days later, in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011), the Court applied strict scrutiny to an Arizona statute that did not ban speech, but provided discriminatory financial support to publicly financed candidates in response to the amount of privately financed speech of their opponents.

Second, this Court declined to apply strict scrutiny in *SKF* because Congress did not enact the CDSOA for the *purpose* of suppressing speech. But the Supreme Court subsequently rejected a benign motive as a reason for denying strict scrutiny in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010). Instead, it held that even though Congress acted with perfectly legitimate motives in proscribing Americans from providing material support to terrorists, the fact that the statute applied to support in the form of speech, and treated speech differently based on its content, meant that intermediate scrutiny was inappropriate. *Id.* at 2724.

Third, the Court relied in part on the fact that the CDSOA involves "regulation of . . . activities of a commercial nature," *SKF*, 556 F.3d at 1355. In

19

*Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010), however, the Supreme Court made perfectly clear that when corporations speak on matters of public interest, they are entitled to the same level of First Amendment protection as individuals.

**B.** The Supreme Court's intervening decision in *Sorrell* also makes clear that even if the CDSOA were subject only to commercial speech scrutiny, the *SKF* panel misapprehended the proper application of that test when a statute discriminates on the basis of content or viewpoint. Among other things, *Sorrell* instructs that such facially discriminatory statutes are unconstitutional if the government "offers no explanation why remedies other than content-based rules would be inadequate" to fulfill is legitimate interests. 131 S. Ct. at 2669. This Court did not ask that question in *SKF*, and if it had, it would have been compelled to reach the contrary result.

**III.** In light of the Supreme Court's subsequent decisions, the CDSOA's petition support requirement, as construed by the CIT and applied to Ashley, is unconstitutional. As discussed, such facial viewpoint discrimination is subject to strict scrutiny, and the government has not contended that the statute could meet that demanding standard of review. Indeed, even under the lesser scrutiny of the commercial speech doctrine, the statute cannot survive as applied to

20

Ashley. If, as this Court held in *SKF*, the purpose of the distributions is to encourage manufacturers to assist in the enforcement of our trade laws, and if Congress has concluded that answering a questionnaire provides sufficient assistance to warrant a reward, there is no legitimate basis for discriminating among companies that provide the exact same level of litigation assistance on the basis of nothing more than the content of their speech.

**IV.** That said, this Court need not overrule the holding of *SKF* or hold the CDSOA unconstitutional in order to resolve this case. Because *SKF* is appropriately understood to uphold the statute as applied to companies that actively oppose a petition, and because Ashley engaged in no such active opposition, this Court can simply limit *SKF* to its actual holding. Moreover, the CDSOA is easily subject to a saving construction. The statute permits distributions to "a petitioner or interested party *in support* of the petition." 19 U.S.C. § 1675c(b)(1)(A) (2000) (emphasis added). Rather than construe "in support" as referring to speech – *i.e.*, to the abstract expression of support or opposition in the questionnaire – this Court should read the statute consistent with its observation in *SKF* that a company can provide "support" through "litigation support," 556 F.3d at 1353, that is, "supporting a petition *by completing a questionnaire*," *id.* at 1358 (emphasis added). That construction

21

of the statute is compatible with the statutory language, the underlying purpose of the provision (*i.e.*, to "reward injured parties who assisted government enforcement of the antidumping laws," *id.* at 1352, as Ashley has done), and this Court's obligation to construe statutes to avoid serious constitutional questions.

## ARGUMENT

### I.    Standard Of Review.

This Court reviews the questions of law decided by the CIT de novo. *See, e.g. SKF USA v. U.S. Customs & Border Protection*, 556 F.3d 1337, 1349 (Fed. Cir. 2009) ("[R]eview of statutory and constitutional issues" decided by the CIT "is de novo").

### II.    This Court's Decision In *SKF* Did Not Resolve The Proper Application Or Constitutionality Of CDSOA's Petition Support Requirement As Applied To Firms Whose Only Opposition To A Petition Is The Expression Of An Opinion On The Desirability Of Antidumping Duties.

In *SKF*, this Court decided the constitutional claims of a foreign-owned corporation that did not simply express abstract opposition to an antidumping petition, but actively opposed it in a way that made it indistinguishable from a defendant in a qui tam or other civil action. Relying on that analogy, this Court concluded that the First Amendment does not preclude withholding a

22

distribution from such a company because of the long established (and presumptively constitutional) practice of discriminating between successful plaintiffs and unsuccessful defendants in civil litigation. *SKF*, 556 F.3d at 1356 (citing *Vt. Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 776-77, 793-794 nn. 5-7 (2000)).

This case is critically different. Other than expressing abstract opposition to the petition, Ashley did nothing to oppose it and did much to assist in the government's investigation by providing full, costly responses to lengthy questionnaires. In the terms of *SKF*'s analogy, Ashley was a witness, not a defendant. Accordingly, the constitutional question here is not whether Congress can constitutionally treat plaintiffs differently from defendants (the question in *SKF*), as it does when it awards attorney's fees or a qui tam award to prevailing plaintiffs. Instead, the question is whether Congress may discriminate between *two identically situated witnesses* (like Ashley and Oakwood Interiors) based solely on their expressed viewpoint on a matter of political controversy and public concern. That question was not presented in *SKF* and to the extent there is language in the decision suggesting a view on the answer, it is ill-considered dicta with no binding effect in this case.

23

A.    **The Only Question Presented And Decided In *SKF* Was Whether CDSOA Is Constitutional As Applied To Companies That Actively Oppose An Antidumping Petition.**

Determining the scope of *SKF*'s precedential authority requires examining both the facts of the case and the Court's rationale.

SKF, a foreign-owned domestic manufacturer of antifriction bearings, opposed a petition seeking antidumping duties on imports of antifriction bearings from various countries, including the imports of SKF's foreign parent company. In addition to expressing opposition to the petition in the ITC questionnaire, SKF actively participated as a party in the administrative proceedings, presenting written and oral evidence and arguments in opposition to the petition. 556 F.3d at 1359.

When the investigation nonetheless resulted in an antidumping order, at the time of the annual CDSOA distribution process, SKF sought a portion of the antidumping duties. However, its request was denied on the grounds that it had not satisfied the petition-support requirement. *SKF*, 556 F.3d at 1345. SKF sued, alleging that the denial violated the First Amendment and the equal protection clause of the Fifth Amendment, and prevailed before the CIT. *See SKF USA Inc. v. United States*, 30 CIT 1433, 1446-47, 451 F. Supp. 2d 1355, 1366-67 (Ct. Int'l Trade 2006). On appeal, however, this Court reversed,

24

applying the intermediate scrutiny applicable to commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), to hold that the petition-support requirement was not unconstitutional as applied to SKF. *See SKF*, 556 F.3d at 1355.

The Court acknowledged that serious First Amendment questions would arise if the statute were construed to distinguish between companies based on nothing more than their expressed support for, or opposition to, a proposed antidumping duty. In particular, this Court recognized that the Supreme Court has "held unconstitutional the distribution of a government benefit designed to favor the speech preferred by the government." *SKF*, 556 F.3d at 1351. In light of that authority, the court agreed that a "limiting construction of the statute is necessary to cabin its scope so that it does not reward a mere abstract expression of support." *Id.* at 1353. Accordingly, the Court held that the CDSOA must be applied to "reward[] actions (litigation support) rather than the expression of particular views." *Id.* In particular, it held that the statute must be read to "only permit distributions to those who actively supported the petition" so that "a party that did no more than submit a bare statement that it was a supporter without answering questionnaires or otherwise actively participating would not receive distributions." *Id.* at 1353 n.26.

25

The Court then held that withholding payments from SKF, while providing them to other companies that actively supported the petition, was consistent with the First Amendment. Providing distributions to those who expressed support for the petition and answered the ITC questionnaires rewarded the substantial practical assistance provided to the government, not favored speech. *SKF*, 556 F.3d at 1358. The Court noted that "ITC questionnaires in particular are extremely detailed, requesting several years of data on a domestic producer's shipments, employment, sales, finances, pricing, customers, and competitors," and that "the costs of responding to such questionnaires are substantial." *Id.* Thus, those rewarded did more than simply express a favorable opinion on the petition.

At the same time, the Court explained, SKF constitutionally could be denied payment because it did much more than simply express abstract opposition to the petition. The Court explained that "SKF here undertook a role that was nearly indistinguishable from that played by a defendant in a qui tam or attorney's fees award case." *SKF*, 556 F.3d at 1358-59. In particular:

> At the ITC's . . . preliminary determination conference, SKF urged through counsel that [the] petition be denied, and provided an analysis of data to refute [petitioner's] assertion that the U.S. antifriction bearing industry was being or was about to be materially injured by dumping. At the ITC's . . . final

determination hearing, SKF urged through counsel that the domestic antifriction bearing industry was not being materially injured by dumping and was not threatened with material injury. To support this argument, SKF's president testified that the history of the production capacity, capital investments, and sales prices of the domestic antifriction bearing industry demonstrated that it was not being materially injured. SKF submitted an economic analysis brief, and at the hearing SKF's economic expert, Dr. Peter Linneman, a professor at the Wharton School of the University of Pennsylvania, testified about how his pricing analysis of the antifriction bearing industry showed no evidence of actual or threatened material injury. SKF's counsel also introduced testimony from the executives and counsel of several foreign antifriction bearing producers that opposed [the] petition.

*Id.* at 1359.

Accordingly, the Court held, the statute was constitutionally applied in *SKF* because the distinguishing factor between SKF and petition supporters was the difference in the practical support each provided to the investigation, not their viewpoint. *SKF*, 556 F.3d at 1359.[6]

---

[6] The Court was also sensitive to the perverse result that would arise if SKF, a subsidiary of a foreign company upon which duties had been imposed, was allowed to recoup those duties as CDSOA distributions, as this would indirectly give a partial refund of antidumping duties to the very companies engaged in the illegal trade practice. *See SKF*, 556 F.3d at 1358. No such concern is present here, since Ashley is a U.S. company with no foreign parent.

**B.    The Manufacturer's Active Opposition Was Central To The Court's Analysis And Holding In *SKF*.**

Two aspects of this Court's decision demonstrate that SKF's active opposition to the petition was critical to this Court's analysis and, thus, distinguishes that case from this one.

*First*, this Court recognized in *SKF* that CDSOA would be unconstitutional if the only distinction between those given and those denied a distribution was the parties' expression of abstract support for, or opposition to, a petition.    The Court openly acknowledged that if the petition support requirement penalized a manufacturer "for expressing its views" that "might well render the statute unconstitutional." 556 F.3d at 1351 (internal quotation marks omitted).    The Court avoided that result, however, by construing the statute to "reward[] actions (litigation support) rather than the expression of particular views." *Id.* at 1353.

The Court was not so naive as to believe that all constitutional difficulties could be resolved by simply re-imagining the purposes of the statute.    It recognized that it is the statute's *actual operation* that counts. *SKF*, 556 F.3d at 1353. For example, although the statute unambiguously authorizes distributions to "persons that indicate support for the petition *by letter* or through questionnaire response," 19 U.S.C. § 1675c(d)(1) (2000) (emphasis added), this

28

Court held that the "by letter" clause could not be enforced consistent with the First Amendment. The Court explained that allowing distributions to those who do nothing more than express support by letter – and therefore provide no practical assistance to the investigation – while disallowing them to those who expressed abstract opposition to the petition, would unconstitutionally "reward a mere abstract expression of support." *SKF*, 556 F.3d at 1353. Accordingly, the Court adopted a "limiting construction of the statute," *id.*, denying distributions to those who "did no more than submit a bare statement that it was a supporter without answering questionnaires or otherwise actively participating" in the proceeding, *id.* at 1353 n.26. That limiting construction – more accurately, partial invalidation – was only justified because this Court rightly perceived that the statute was constitutional only to the extent it distinguished between parties because of differences in their active participation in the antidumping investigation rather than based on differences in their "abstract expression of support" or opposition. *Id.* at 1353.

For that reason, it was critical to the outcome of the case that SKF did not merely express abstract opposition, but undertook to actively oppose the petition in the administrative proceedings. This Court recognized that just as it would be unconstitutional to *provide* distributions based on nothing more than

29

expressions of abstract *support* (*e.g.*, to the letter-writers), it would be unconstitutional to *deny* distributions based on nothing more than expressions of abstract *opposition*. That is why this Court exhaustively detailed the extent to which SKF actively opposed the petition by undertaking "a role that was nearly indistinguishable from that played by a defendant in a qui tam action." *SKF*, 556 F.3d at 1358. If it had been enough that SKF simply marked a box stating that it opposed the petition, the Court would have had no reason to discuss SKF's actual, tangible opposition. That discussion was necessary for the same reason this Court's elimination of distributions for letter-writing supporters was necessary – to ensure that the statute distinguished among manufacturers based on their *actions*, rather than their expressed viewpoints.

In this case, however, Ashley did not actively oppose the petition. It filed no briefs, presented no witnesses, and sent no lawyers to argue against the proposed duties. *Cf. SKF*, 556 F.3d at 1358-59. To the contrary, Ashley provided as much *support* for the petition as many firms that received distributions – *i.e.*, it filled out the extensive ITC questionnaires that were critical to the ITC's material injury investigation. *Id.* at 1357. Accordingly, this case presents the question that the Court was able to avoid in *SKF* – is the statute constitutional as applied when the *only* difference between a party

30

denied a distribution and others given a share of the duties is the parties' speech?

*Second,* SKF's active opposition to the petition is also what enabled this Court to resolve the constitutional question through an analogy to civil litigation. The Court could credibly compare SKF to a defendant only because SKF actively opposed the petition by appearing through counsel, presenting expert witnesses and other testimony, and submitting briefs urging denial of the petition. *SKF*, 556 F.3d at 1359. A party like Ashley that does nothing more than fill out questionnaires under legal compulsion is nothing like a defendant in a lawsuit. Rather, it is the equivalent of a witness. Accordingly, the fact that there is a longstanding, unquestioned tradition of awarding fees to successful plaintiffs but not to unsuccessful defendants, *id.* at 1356, provides no insight into the constitutional question posed by the facts of this very different case, where the statute discriminates between similarly situated witnesses based on their viewpoints on a political question of public concern.

**C.    Any Statements In *SKF* Regarding The Act's Constitutionality As Applied In Circumstances Not Before The Court Were Dicta.**

It is true that although *SKF* focused principally on SKF's active opposition to the petition in that case, the decision includes one paragraph that

discusses parties that express abstract opposition to (or take no position on) a petition without taking any other steps to oppose the petition. *See* 556 F.3d at 1359. In relevant part, that discussion comprises three sentences. The first continues the Court's analogy to parties in litigation, noting that "the role of parties opposing (or not supporting) the petition in responding to questionnaires is similar to the role of opposing or neutral parties in litigation who must reluctantly respond to interrogatories or other discovery." *Id*. The next sentence contains the entirety of the Court's analysis: "There is no suggestion that such parties must be favored by an award of attorney's fees or other compensation similar to that given to prevailing plaintiffs who successfully enforce government policy." *Id*. The third sentence simply concludes that "[i]t was thus rational for Congress to conclude that those who did not support the petition should not be rewarded." *SKF*, 556 F.3d at 1359.

To the extent these statements refer to "opposing" parties like SKF, who engaged in active opposition to the petition, they have no bearing on this case. But to the extent this passage is understood to opine on "neutral parties" like Ashley, who do nothing more than the equivalent of "respond[ing] to interrogatories or other discovery," *SKF*, 556 F.3d at 1359, the passage was not necessary to the *SKF* decision, contains almost no analysis, and is not binding

32

on this panel. *See, e.g., Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1307 (Fed. Cir. 2004) ("[S]tatements made in dicta . . . 'cannot be considered binding authority.'") (quoting *Kastigar v. United States*, 406 U.S. 441, 454-55 (1972)). Having already explained that SKF was the equivalent of a *defendant* in a civil action by virtue of its active opposition to the petition, there was no need for the Court to opine on the statute's constitutionality as applied to "neutral parties" akin to witnesses. *Id.*

The ITC nonetheless construed *SKF* as precluding all future First Amendment challenges to the CDSOA, even by very differently situated parties. But as the Supreme Court explained more than 70 years ago, a "law which is constitutional as applied in one manner may still contravene the Constitution as applied in another." *Watson v. Buck*, 313 U.S. 387, 402 (1941).[7] "Since all contingencies of attempted enforcement cannot be

---

[7] This is true whether the Court's decision in *SKF* is characterized as rejecting a facial or an as-applied challenge to the statute. A court considering a facial First Amendment challenge need not decide whether *all* of the statute's applications are constitutional – the statute will be sustained so long as *most* of the applications are consistent with the First Amendment, even if some applications not before the court might run afoul of the Constitution. *See, e.g., United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (party bringing facial First Amendment challenge to a statute must show that "a substantial number of its applications" are unconstitutional) (internal quotation marks omitted).

envisioned in advance of those applications," courts are required to decide only "cases involving particular provisions as specifically applied to persons who claim to be injured." *Id.* To do otherwise "is analogous to rendering an advisory opinion upon a statute or a declaratory judgment upon a hypothetical case." *Id.*[8]

The wisdom of that approach is aptly illustrated here. Because SKF actively opposed the petition, there was no party before the Court that had an interest in briefing the constitutional significance of the distinction between a party that actively opposes a petition (the equivalent of a defendant) and one

---

Accordingly, rejecting a facial challenge to a statute does not preclude future successful as-applied challenges. *See, e.g., Citizens United v. FEC*, 130 S. Ct. 876, 894 (2010); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457-58 (2008). At the same time, a court resolving an as-applied challenge to a statute obviously decides only the constitutionality of the statute as applied in the specific context of the case before it. *See, e.g., NEA v. Finley*, 524 U.S. 569, 586-87 (1998).

[8] Contrary to Defendants' suggestions below, the fact that a court may sometimes adopt a "saving construction" of a statute to avoid having to declare the Act unconstitutional *in the case before it* does not somehow free the court from the obligation to avoid issuing advisory opinions on the statute's constitutionality as applied to cases *not* before it. A construction may well save the state as applied in some circumstances, but not others, and the panel adopting the construction has no power to issue an advisory opinion as to the statute's constitutionality, as construed, when applied to different circumstances in a future case.

that simply expresses abstract opposition to it in the course of answering a questionnaire (the equivalent of a witness or other neutral party).[9]

That lack of adequate briefing is reflected in the Court's casual, and ultimately inadequate, analysis. The constitutional question here is not whether the First Amendment would permit Congress to give attorney's fees only to plaintiffs and not to witnesses. *See SKF*, 556 F.3d at 1359. It clearly can. If the CDSOA did the equivalent by providing distributions only to the *petitioners* in an antidumping proceeding (*i.e.*, the plaintiffs), and denying them to all companies that simply filled out a questionnaire (*i.e.*, neutral parties or witnesses), there would be no constitutional claim. The constitutional difficulty arises because the CDSOA goes further and provides distributions to *some* neutral parties/witnesses, but not others, based solely on viewpoint.

Accordingly, the relevant analogy would be to a statute that awards fees not only to the prevailing plaintiff, but also to witnesses, but only if the witness

---

[9] Instead, the briefing in *SKF* focused on SKF's peculiar role not only as a company that had opposed the petition, but also as a subsidiary of a company that had been forced to pay duties. *See* U.S. Customs & Border Protection's Response to SKF USA Inc.'s Pet. for Reh'g En Banc at 4-5, *SKF*, 556 F.3d 1337 (No. 2008-1005) (May 21, 2009) (arguing that providing distributions to SKF would "perversely, give back to the foreign dumpers the same antidumping duties that they had paid, to the continuing detriment of domestic industries.").

35

expresses public support for the plaintiff's position. That is an entirely different question than the one the Court confronted in *SKF*, or answered in the unfortunate dicta upon which Defendants now rely. The question warrants thorough and independent consideration, consideration it was denied in the ITC by that court's misimpression that it was bound in this case by *SKF*.[10]

## II.    The Doctrinal Foundations Of *SKF* Have Been Fatally Undermined By Subsequent Supreme Court Decisions.

Even if *SKF* were binding authority in this case, its doctrinal foundations have been so eroded by subsequent Supreme Court decisions that its holding must be reconsidered. *See, e.g., Doe v. United States*, 372 F.3d 1347, 1354

---

[10] Although the CIT did not rely on it, in prior briefs, the United States has argued that "this Court's decision in *PS Chez Sidney* removes any doubt that *SKF* forecloses all constitutional challenges to the CDSOA upon First Amendment grounds." Appellant United States' Motion for Summary Affirmance 8 (Mar. 9, 2012). Not so. To start, the order in that case was unpublished and therefore establishes no precedent binding on any court. *See* Fed. Cir. R. 32.1(d). In addition, no constitutional question was briefed in that case, as Chez Sidney stipulated that the only issues remaining to be litigated were its non-constitutional arguments. *See* Plaintiff-Cross Appellant PS Chez Sidney, LLC's Reply Mem. in Support of Motion to Lift Stay at 1-2, *PS Chez Sidney v. United States*, No. 2008-1526 (Fed. Cir. July 2, 2010). Accordingly, this Court was never asked to decide whether the factual differences between the plaintiffs in *SKF* and *Chez Sidney* – much less the differences between Ashley and SKF – required different results. Nor was the Court asked to consider the important intervening cases from the Supreme Court that draw *SKF*'s holding into question, as discussed next.

36

(Fed. Cir. 2004) (prior circuit authority is binding "unless undermined by intervening Supreme Court or en banc authority"); *see also Easter v. United States*, 575 F.3d 1332, 1337 (Fed. Cir. 2009) (prior panel decisions are open to reconsideration in light of "an intervening Supreme Court decision clearly undermining" the prior precedent); *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1275 (Fed. Cir. 2005) (noting that panel "would not be free to reject the Supreme Court's" intervening decision "in favor of the rationale of our decision" in a prior Federal Circuit case).

In particular, recent Supreme Court decisions make clear that the *SKF* panel erred in declining to apply strict scrutiny to the statute and that, in any event, the panel misapplied the test for commercial speech applicable to a statute that facially discriminates on the basis of viewpoint.

## A.    Intervening Supreme Decisions Make Clear That The CDSOA Is Subject To Strict Scrutiny.

Although statutes that discriminate on the basis of viewpoint are ordinarily subject to strict scrutiny, *see, e.g., Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011), this Court concluded that the lesser standard of the commercial speech doctrine "seem[ed] appropriate," *SKF USA, Inc. v. United*

37

*States Customs & Border Protection*, 556 F.3d 1337, 1355 (Fed. Cir. 2009), for three reasons.

*First*, the Court decided that because "the statute does not *prohibit* particular speech," but instead withholds a benefit, cases applying strict scrutiny to content-based bans "are of little assistance in determining the constitutionality of" the CDSOA. *Id.* at 1350 (emphasis added).

*Second*, the Court reasoned that in "considering limited provisions that do no ban speech entirely, the purpose of the statute is important." *SKF*, 556 F.3d at 1350. Because the Court did not view the statute as intended to suppress disfavored speech, but rather "to reward injured parties who assisted government enforcement of the antidumping laws," strict scrutiny was not appropriate. *Id.* at 1352.

*Third*, the Court observed that while the commercial speech test was developed in cases involving restrictions on advertising, it has also "been applied . . . to regulation of other activities of a commercial nature," supporting the Court's decision to apply the *Central Hudson* test in this case. *SKF*, 556 F.3d at 1355.

Since that decision, the Supreme Court has rejected each of these reasons as a basis for denying strict scrutiny to statutes that facially discriminate on the basis of content or viewpoint.

1.    Sorrell *and* Arizona Free Enterprise *Recently Held That Strict Scrutiny Applies To Laws That Burden Speech On The Basis Of Content, Even If They Do Not Ban It Completely.*

The Court's first reason for denying strict scrutiny – that the CDSOA discriminates in distributing a benefit, rather than adopting an outright ban on disfavored speech – did not surve the Supreme Court's recent decision in *Sorrell*, 131 S. Ct. 2653.  In that case, the Supreme Court struck down a Vermont statute that prohibited data mining companies (but not others, like insurance companies) from disclosing certain prescription data.  The Court explained that "heightened judicial scrutiny [wa]s warranted" because the statute imposed a "content-based *burden* on protected expression." *Id.* at 2664 (emphasis added).

In holding that a content-based "burden" was sufficient to invoke strict scrutiny, the Court explained that "the distinction between laws burdening and laws banning speech is but a matter of degree and that *the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.*" *Sorrell*, 131 S. Ct. at 2664 (emphasis added) (internal quotation

39

marks omitted). Thus, in the case before it, the Court held that the Vermont statute "imposed a speaker- and content-based burden on protected expression, and *that circumstance is sufficient* to justify application of heightened scrutiny." *Id*. at 2667 (emphasis added).[11]

Days later, the Supreme Court again rejected the burden-ban distinction in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011). In that case, the Court struck down a campaign finance scheme that responded to fundraising by privately funded candidates by increasing subsidies to publicly funded campaigns. *Id*. at 2814. Under the scheme, if a privately financed candidate spent more than a publicly financed candidate's allocation, then the publicly financed candidate would receive approximately one dollar for each dollar in excess of the allocation spent by her privately

---

[11] The Court's recent decision in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010), makes the same point. The Court acknowledged that corporations are given numerous benefits that are not enjoyed by individuals, including "limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets." *Citizens United*, 130 S. Ct. at 905 (internal quotation marks omitted). While the government has no obligation to provide those benefits to corporations, the Court made clear that the government may not burden corporations' First Amendment rights by conditioning receipt of these legal benefits on corporations' forgoing full First Amendment protection for their speech. *See id*. (holding that it is "rudimentary that the State cannot exact as the price of those special advantages the forfeiture of First Amendment rights") (internal quotation marks omitted).

40

financed opponent. *Id.* The statute did not in any way restrict or limit the speech, fundraising, or expenditures of privately financed candidates. Instead, it merely provided a subsidy to those candidates' opponents.

In striking the statute down, the Court again rejected any claim that such a law is subject to lesser scrutiny because it did not ban speech. *Arizona Free Enterprise*, 131 S. Ct. at 2818. Instead, the Court applied strict scrutiny, explaining that by subsidizing their electoral opponents, the scheme imposed an unconstitutional burden on speech. *Id.* Even the vigorous dissent recognized that subsidies that "discriminate on the basis of viewpoint" are subject to, and generally fail, strict scrutiny. *Id.* at 2834 (Kagan, J., dissenting).

Like the campaign funding scheme invalidated in *Arizona Free Enterprise*, CDSOA does not simply withhold a benefit on the basis of speech – it compounds the injury by giving the funds that disfavored speakers otherwise would receive *to their competitors*. In this case, for example, CDSOA distributes millions of dollars to Ashley's domestic competitors, money that may be used to invest in equipment and facilities, or workforce training, to

secure a lasting competitive advantage against disfavored speakers like Ashley.[12]

The CIT's attempted to distinguish *Sorrell* and *Arizona Free Enterprise*, but its reasoning is unpersuasive. The court ruled that *Arizona Free Enterprise* was irrelevant because it involved political speech. *See Ashley*, Slip Op. 12-14 at 24-25 (JA000024 - JA000025). But the desirability of imposing trade sanctions on one of our nation's most important international trading partners is indisputably a political issue. *See, e.g.*, President Barack Obama, 2012 State of the Union Address (Jan. 24, 2012) (discussing the need to expand international trade, and also specifically the need to curb unfair trading practices emanating from China).

Moreover, even if Ashley's opposition to an antidumping petition were not considered political speech, the Court recently explained that "speech on public issues," no less than political speech, "occupies the highest rung of the

---

[12] The CDSOA distribution scheme allocates resources to affected domestic producers on the basis of their qualifying expenditures, which are certain expenditures accrued after an antidumping order is put in place. 19 U.S.C. § 1675c(b)(4) (2000). Typically, the reported expenditures far exceed the duties collected, so the companies each receive pro-rata shares of the distribution, and the approved producers share any funds that would have gone to any excluded producer.

42

hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (internal quotation marks omitted). The CIT did not contest that, at the very least, Ashley's opposition constitutes speech on a matter of public concern. Nor could it, after the Supreme Court's recent decision in *Snyder*. There, the Court held that "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." 131 S. Ct. at 1216 (citation omitted) (internal quotation marks omitted). Here, the petition to impose duties on Chinese wooden bedroom furniture was genuinely controversial within the domestic furniture-making industry, with some producers supporting it and other fearing that imposing duties on China might prompt a harmful trade war or that increased prices would suppress overall domestic demand for furniture. *See* Jeanne J. Grimmett, Cong. Research Serv., RL33045, The Continued Dumping & Subsidy Offset Act ("Byrd Amendment") 21 (2005) (noting that "many U.S. furniture manufacturers in support of the investigation speculated that the cost of lost business from U.S. retailers in retaliation for their support

43

may well exceed the combined benefit of the [antidumping] order and CDSOA disbursements.").[13]

It is thus no surprise that although *Sorrell* also did not involve the regulation of elections or any political question, the Supreme Court applied the same rule that content-based burdens on speech are subject to the same strict scrutiny as laws that ban such speech entirely. *Sorrell*, 131 S. Ct. at 2664. The CIT sought to avoid the plain instruction of *Sorrell* by noting that the Vermont statute in that case "authorized civil remedies" whereas CDSOA withholds benefits. *Ashley*, Slip Op. 12-14 at 22-23 (JA000022 - JA000023). But that is precisely the distinction the Supreme Court in *Sorrell* held to be constitutionally irrelevant. *See* 131 S. Ct. at 2664 (holding that "the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.") (internal quotation marks omitted).

---

[13] *See also* Susan Lorimor, *Furniture Manufacturers and Retailers Face Off,* Wood & Wood Products, Dec. 2003; Susan Lorimor, *Filing of Furniture Antidumping Petition Sparks Controversy,* Wood & Wood Products, Nov. 2003; Stefan Wille, *Antidumping Petition Against the Chinese Furniture Industry: An Economist's Point of View,* Wood & Wood Products, Oct. 2006; *Hooker Furniture Withdraws Support For Anti-Dumping Petition; Sites* [sic] *Industry Divisiveness As Cause,* RTO Magazine (Feb. 16, 2004).

The CIT also noted that *Sorrell* ultimately held that the statute in that case failed intermediate scrutiny under the test for commercial speech. *Ashley*, Slip Op. 12-14 at 23 (JA000023). The CIT apparently concluded on that basis that *Sorrell* does not require applying strict scrutiny to facially discriminatory statutes like CDSOA. *Id.* (JA000023). But any such inference misreads the Court's opinion in *Sorrell*. The analysis in *Sorrell* has two parts. The first part (Section II(A)) addressed "whether [the Vermont statute] must be tested by heightened judicial scrutiny." *Sorrell*, 131 S. Ct. at 2663. In that section, the Court held that "content-based burdens must satisfy the same rigorous scrutiny as content-based bans." *Id.* at 2664 (internal quotation marks omitted). As described above, that instruction is incompatible with the first reason this Court gave for declining to apply strict scrutiny to the CDSOA in this case.

In the second part of its analysis (Section II(B)), the Court then separately addressed the State's contention that even if strict scrutiny would ordinarily apply, only intermediate scrutiny was warranted in that case "because, assuming [the statute] burdens speech at all, it at most burdens only commercial speech." *Sorrell*, 131 S. Ct. at 2667. The Court ultimately did not have to resolve that contention because in the case before it, "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial

45

scrutiny is applied." *Id*. That holding obviously did nothing to detract from the Court's rejection of the burden-ban distinction in the prior section of its opinion. Indeed, rather than supporting the CIT's decision, the Court's application of the commercial speech test in *Sorrell* provides a second, independent reason to revisit the holding of *SKF*, as explained below. But for present purposes, the point is simply that the Supreme Court's ultimate rejection of the Vermont law under the *Central Hudson* test does not – contrary to the CIT's decision – provide a reason to disregard the Court's separate rejection of the burden-ban distinction upon which *SKF* relied.

Finally, the CIT also attempted to brush aside *Sorrell* as involving a statute that was enacted for the *purpose* of suppressing speech, while this Court decided in *SKF* that CDSOA was not enacted for any suppressive purpose. *Ashley*, Slip Op. 12-14 at 23 (JA000023). But nothing in the *Sorrell* decision suggests that the Court believed that strict scrutiny applies to discriminatory burdens on speech only if enacted for the overt purpose of suppressing disfavored speech. Instead, the Court made clear that facial discrimination is all that is required to prompt strict scrutiny – the Court found that the challenged statute "impose[d] a speaker- and content-based burden on protected expression, and *that* circumstance is *sufficient* to justify application of

46

heightened scrutiny." *Sorrell*, 131 S. Ct. at 2667 (emphasis added). In fact, the Court recognized that the Vermont legislature's "stated policy goals may be proper," but held that the statute was nevertheless unconstitutional because it did not achieve those goals in a permissible way. *Id.* at 2670.

2.    *The Court's Decision in* Humanitarian Law Project *Makes Clear That A Suppressive Purpose Is Not Required To Invoke Strict Scrutiny Of A Facially Discriminatory Statute.*

The Supreme Court's recent decisions also reject the *SKF's* panel's second reason for applying lesser scrutiny to the CDSOA – the lack of a suppressive purpose.

As just noted, the Court in *Sorrell* found that heightened scrutiny applies to any statute that burdens speech, even when enacted for a legitimate purpose unrelated to the suppression of speech. The Court repeated that teaching in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010). There, the Supreme Court considered a statute criminalizing the provision of material support to terrorist organizations, even when such support took the form of speech. The Court accepted that, like the CDSOA, the material support statute was not enacted for the purpose of suppressing speech. *Id.* at 2723 (acknowledging that Congress had not "sought to suppress ideas or opinion in the form of 'pure political speech'"). Nonetheless, the statute prohibited some

47

forms of speech, depending on their content, *id.*, and that was sufficient, in itself, to invoke the "more demanding standard" of strict scrutiny. *Id.* at 2724.

*Humanitarian Law Project* thus emphasizes that strict scrutiny under the First Amendment is not reserved for those instances in which the government announces its desire to suppress a particular viewpoint. Even when the statute's goal is salutary, the question is what the law does in order to achieve that goal. When, as here, a statute burdens a particular viewpoint – and especially when, as here, the burdened viewpoint is critical of proposed government conduct – strict scrutiny applies regardless of the enactors' purposes.

3.      Citizens United *Makes Clear That Strict Scrutiny Applies Equally To Laws That Burden Speech Relating To "Activities Of A Commercial Nature."*

Finally, this Court's apparent belief that the commercial speech doctrine should be applied, in part because CDSOA involves "regulation of . . . activities of a commercial nature," *SKF*, 556 F.3d at 1355, has been critically undermined by the Supreme Court's subsequent decision in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010).

In *Citizens United*, the Supreme Court held unconstitutional federal limitations on the electioneering communications by corporations. Of central relevance here, the Court held that that corporate speech on matters of public

48

interest receives the same strict scrutiny under the First Amendment as individual speech. *Citizens United*, 130 S. Ct. at 913. The Court explained that "[p]olitical speech is indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *Id.* at 904 (internal quotation marks omitted). The Court thus rejected its prior conclusion in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), that the government has an interest in counterbalancing the allegedly distorting effects of corporate speech on public debate. *Citizens United*, 130 S. Ct. at 906, 913. That view, the Court held, was incompatible with the First Amendment's commitment a "marketplace of ideas" free from government interference. *Id.* at 906 (internal quotation marks omitted).

This Court's conclusion in *SKF* that the CDSOA is subject to the lesser protection of the commercial speech doctrine cannot survive in the wake of *Citizens United*. The Supreme Court has now made perfectly clear that so long as speech relates to matters of public concern, it makes no difference whether it also involves corporations or "activities of a commercial nature." *SKF*, 556

F.3d at 1355.[14] The Court explained that the First Amendment is "[p]remised on mistrust of governmental power," and thus "stands against attempts to disfavor certain subjects or viewpoints." *Citizens United*, 130 S. Ct. at 898. A central fault of the campaign limitations the Court struck down was that they precluded businesses that disagree with a government policy from making that disagreement known, while simultaneously allowing government agencies to use their broad powers behind the scenes to encourage companies to acquiesce to government policies. *Id.* at 907. As applied to entities like Ashley, the petition-support requirement likewise has the same effect of discouraging dissent against proposed antidumping enforcement actions.[15]

---

[14] Ashley has never argued that under *Citizens United* "any statute affecting speech relating to matters of public concern, whether made by individuals or corporations, is to be subjected to a strict scrutiny standard." *Ashley*, Slip Op. 12-14 at 19. Rather, *Citizens United* shows that (a) the constitutional test does not vary depending on the corporate identity of the speaker; and (b) that statutes that *discriminate* on the basis of content or viewpoint are subject to strict scrutiny.

[15] *Citizens United* also makes clear that the CDSOA independently violates the First Amendment by withholding distributions even from those who otherwise support the government's investigation unless they make their support *public. See SKF*, 556 F.3d at 1345 n.9. In *Citizens United*, the Court noted that disclosure requirements, although they "do not prevent anyone from speaking," nevertheless "burden the ability to speak" by forcing speakers to identify themselves to the world and thus risk reprisals for their speech. 130 S. Ct. at 914 (internal quotation marks omitted). These requirements, the Court

The CIT attempted to distinguish *Citizens United* on the ground that in that case, the statute regulated political speech. *Ashley*, Slip Op. 12-14 at 19-21 (JA000019 – JA000021). But as already explained, speech on matters of trade policy *is* political speech and, in any event, nothing in the Court's rationale in *Citizens United* suggests that the Supreme Court would tolerate facial viewpoint discrimination against corporations on matters of public importance like trade policy.

*     *     *     *     *

The CIT's hodge-podge of factual distinctions between the Supreme Court's recent decisions and the facts of this case fail to give due deference to Supreme Court authority. As this Court has explained, "[w]hen an opinion

---

held, must be subjected to "'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)). The public aspect of the petition-support requirement cannot pass such scrutiny, as it bears no relation at all to this Court's adopted rationale for the rule, which is to reward those who provide practical assistance to the government beyond expressions of abstract support. *SKF*, 556 F.3d at 1352. The statute's unconstitutional application in such cases renders the statute unconstitutionally overbroad on its face, even as applied to a claimant, like Ashley, that did not support the petition. *See, e.g., United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) ("[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'") (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

51

issues for the [Supreme] Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *DaimlerChrysler Corp. v. United States*, 361 F.3d 1378, 1384 (Fed. Cir. 2004) (quoting *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996)).[16] The question is not whether there are factual differences between this case and the Court's recent precedents; the question is whether those differences are *material* given the legal principles the Supreme Court adopted to resolve the case before it. And for the reasons given above, the principles employed by the Supreme Court in its recent cases apply equally here and make clear that this Court erred in declining to apply strict scrutiny to CDSOA's facial discrimination on the basis of speech.

---

[16] *See also, e.g., DaimlerChrysler Corp.*, 361 F.3d at 1385 n.3 (noting that "the Federal Circuit is obligated to follow a Supreme Court interpretation even though it may be dicta"); *Schwab v. Crosby*, 451 F.3d 1308, 1326 (11th Cir. 2006) ("[W]ith inferior courts, like ourselves, ... language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." (alterations in original) (internal quotation marks omitted); *United States v. Becton*, 632 F.2d 1294, 1296 n. 3 (5th Cir.1980) ("We are not bound by dicta, even of our own court. . . . Dicta of the Supreme Court are, of course, another matter." (citation omitted)).

**B.    Even If Strict Scrutiny Was Not Required, *Sorrell* Makes Clear That This Court Misapplied The Commercial Speech Test As Applied To A Facially Discriminatory Statute.**

All that said, even if the commercial speech doctrine applies, the *SKF* Court's application of the *Central Hudson* test cannot stand in the aftermath of *Sorrell*.

Like the statute invalidated in *Sorrell*, the CDSOA provides distributions to "all but a narrow class of disfavored speakers." *Sorrell*, 131 S. Ct. at 2668; *see* Int'l Trade Comm'n, Wooden Bedroom Furniture from China, No. 731-TA-1058 (Final), USITC Pub. 3743, at III-2 (Dec. 2004) (JA0000293) (showing that of 54 companies that received questionnaires, only three, including Ashley, publicly opposed the petition). *SKF* concluded that such discrimination was permissible because there was a sufficient fit between the categories drawn by the statute and Congress's legitimate interest in rewarding those who assist an antidumping investigation. *SKF*, 556 F.3d at 1357-59. The Court did not dispute, however, that firms like Ashley provide the *identical* level of practical support for an investigation as others who receive distributions (*i.e.*, filling out a questionnaire and taking no steps to impede the investigation). That disconnect between Congress's purported objective and the means chosen, this Court

concluded, did not render the statute unconstitutional because it was "rational" for Congress to make such a distinction. *Id.* at 1360.

In *Sorrell*, however, the Supreme Court clarified that the fit requirement is much more demanding when a statute discriminates on the basis of content. The Court ruled that even if the commercial speech test permits content-based regulation sometimes (for example, in the false advertising context), that relaxed standard does not apply to viewpoint discrimination. *Sorrell*, 131 S. Ct. at 2672. Instead, the Court held that a statute will fail commercial speech scrutiny if the government "offers no explanation why remedies other than content-based rules would be inadequate" to fulfill is legitimate interests. *Id.* at 2669.

This Court did not ask that question in *SKF*. Instead, the Court upheld the statute because, in its view, it was "rational for Congress to conclude that those who did not support the petition should not be rewarded." 556 F.3d at 1359. Because the Supreme Court has now made clear that this is not enough, this Court must apply the now-governing constitutional standard to Ashley's claims rather than relying on the Court's prior decision in *SKF*

\* \* \* \* \*

54

*Arizona Free Enterprise* and *Sorrell* establish that the same First Amendment test applies whether the government bans speech or simply burdens it by withholding funds from disfavored speakers. *Humanitarian Law Project* and *Sorrell* further hold that lack of a suppressive purpose does not reduce the scrutiny applied to discriminatory statutes. *Snyder* teaches that all speech on matters of public concern merits the highest First Amendment protection, and *Citizens United* makes clear that corporate speech on such matters is entitled to the same level of constitutional protection as individual speech. Finally, *Sorrell* illustrates that viewpoint-discriminatory statutes fail even the lesser scrutiny of the commercial speech test when, as here, the government could achieve its neutral objectives without engaging in discrimination on the basis of speech. Because *SKF* cannot be squared with these principles, the CIT erred in applying *SKF* to dismiss Ashley's claims.

**III. The CIT Erred In Holding That The Free Speech Clause Of The First Amendment Permits Denying Distributions To Ashley Based Solely On Its Expression Of Abstract Opposition To An Antidumping Petition.**

Considered afresh, in light of this recent Supreme Court precedent and the very different circumstances of this case, the CDSOA fails constitutional muster as construed by the CIT and applied to Ashley.

55

1.  As explained in Part II, *supra*, recent Supreme Court decisions leave no room for any argument that statutes that burden speech on matters of public concern on the basis of viewpoint are subject to strict scrutiny. Nor is there any ground to deny that the CDSOA discriminates on the basis of viewpoint as applied by the CIT to Ashley. The *only* difference between companies like Oakwood, Perdues, Bebe, and Tom Seely Furniture (*see* JA000293), which received distributions, and companies like Ashley, which has not, is that Ashley did not support the petition.

Such viewpoint discrimination can survive strict scrutiny only if the government can show that "it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Entm't Merchs. Ass'n.*, 131 S. Ct. 2729, 2738 (2011). To meet this standard, the government must "identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Id.* (citation omitted) (internal quotation marks omitted).

The government has not even attempted to argue that the CDSOA survives strict scrutiny. And indeed, it cannot. First, the viewpoint discrimination enacted by CDSOA does not serve any compelling interest. While the government may have an interest in encouraging companies to reply

to questionnaires that assist in investigations, that interest is not so compelling as to justify viewpoint discrimination. The government has not shown, for example, that prior to the CDSOA there was a genuine problem with convincing firms to comply with their legal duty to answer questionnaires. Nor has it suggested that there has been any such problem in the years after the CDSOA's repeal. This is hardly surprising given that the government has not identified any other legal regime in which such viewpoint discrimination among similarly situated witness-like parties has been considered necessary to promote cooperation with law enforcement.

Even if there were a problem for the petition support requirement to solve, the provision is not even remotely tailored to solving it. The as-applied challenge here arises only when a firm like Ashley has done everything the government has asked of it and taken no practical steps whatsoever to oppose the petition. No one has suggested that the public expression of abstract support in itself provides any material assistance to law enforcement, or that the government has a legitimate (much less compelling) interest in drumming up

public support for its enforcement activities.[17]   Accordingly, like most viewpoint discriminatory statutes, CDSOA does not pass constitutional muster.

Even if this Court applied the commercial speech test for content-based regulations the result would be the same, particularly in light of the Supreme Court's decision in *Sorrell*.  Under the commercial speech test, the government "must show at least that the statute directly advances a substantial government interest and that the measure is drawn to achieve that interest." *Sorrell*, 131 S. Ct. at 2667-68.   Again, even if an interest in encouraging cooperation with a government investigation were a sufficiently substantial interest, the CDSOA is not drawn to achieve it because the statutory scheme is incoherent.  The statute rewards producers who provide minimal practical assistance to an investigation (but express public support for the petition) even as it provides no reward at all to producers who offer much greater practical assistance, at much greater expense, through their questionnaire responses – simply because of their answer on an abstract question of public policy they are required by law to answer.

_____

[17] Moreover, as this Court also held in *SKF*, if the purpose was to compensate injured companies, as the government originally argued, there is no rational (much less narrowly drawn) connection between that interest and the way the statute operates – the correlation between the level of injury and the likelihood of a company publicly supporting the petition is speculative at best.

Instead, the CDSOA distributes funds to any domestic producer that supports a successful petition, and denies funds to all others, regardless of the assistance they render.

At the same time, neither the government, nor this Court in *SKF*, has offered any "explanation why remedies other than content-based rules would be inadequate" to fulfill any interest in rewarding litigation support. *Sorrell*, 131 S. Ct. at 2669. In particular, the government offers no reason why a legislature intent on encouraging firms to support its investigation, and believing that filling out a questionnaire is sufficient support to warrant a reward, would make a distinction between those who provide that assistance based on whether the firm also supported or opposed the government's enforcement agenda.

2. In *SKF*, this Court nonetheless upheld the statute as applied to the manufacturer in that case based on a presumptively constitutional tradition of discriminating between plaintiffs and defendants in awarding attorney's fees and qui tam awards. But that analogy cannot save the statute here, for as applied in this case, the statute discriminates not between plaintiffs and defendants, but among otherwise identically situated witnesses based on nothing other than their speech. As far as Ashley is aware, Congress has never discriminated among witnesses based on whether they support the plaintiff or

59

defendant in litigation. To the contrary, the federal statute providing compensation to witnesses in federal trials has always afforded fees to all witnesses, regardless of whom they support in the litigation and certainly without regard to their publicly expressed views on how the litigation should be resolved. *See* 28 U.S.C. § 1821. Accordingly, there is nothing in our constitutional traditions that should give the Court pause before subjecting the CDSOA to the usual First Amendment analysis applicable to statutes that discriminate on the basis of speech.

Indeed, the effect of the petition support requirement in this case is directly contrary to core First Amendment principles. While the Amendment is designed to protect the "marketplace of ideas," particularly regarding public policy decisions, *Citizens United*, 130 S. Ct. at 906 (internal quotation marks omitted), the petition support requirement warps the debate by giving companies a substantial financial incentive to express public agreement with a course of action they may well believe to be contrary to the national interest. That the government then relied on that distorted debate in determining the

60

course of international trade policy[18] illustrates the damage not only to individual rights, but also to good governance, that arises when federal legislation is allowed to encourage or discourage particular views in the public debate.

IV.  **The CDSOA's Constitutional Difficulties Can Be Avoided By Construing The Statute To Permit Distributions To Firms Like Ashley That Support A Petition By Providing Practical Assistance Through Answering Government Questionnaires While Taking No Action To Oppose The Petition Other Than The Expression Of Abstract Disagreement With The Imposition Of Duties.**

For the foregoing reasons, this Court should, if necessary, hold that *SKF* neither controls this case nor survives intervening Supreme Court decisions. But this Court need not do either in order to resolve this case, for both the specific holding of *SKF* and the CDSOA itself can be preserved through a saving construction.  Specifically, this Court may limit the holding of *SKF* to cases involving active opposition to an antidumping petition and may construe the statute to permit distributions to those who "support" an antidumping petition by answering government questionnaires, so long as they do not actively oppose or impede the investigation.

---

[18] *See* 19 U.S.C. § 1673a(c)(4)(A) (establishing minimum level of domestic industry support for antidumping petition to go forward).

61

As described above, the best reading of *SKF* limits its holding to the facts presented by that case – the CDSOA may constitutionally deny distributions to those who actively oppose an investigation in a manner comparable to a defendant in a qui tam or other action. *See supra* II. That holding has no application here and, as a consequence, need not be revisited in order to resolve Ashley's claims.

At the same, as shown above, the First Amendment will not permit the CDSOA to be applied to deny Ashley a distribution based on its expression of abstract opposition to an antidumping petition. But in *SKF*, this Court rightly recognized that when it is possible to give a statute a construction that avoids a constitutional infirmity, a court is duty-bound to adopt that saving construction, "even when the interpretation finds little support in the literal language of the statute." *SKF*, 556 F.3d at 1349-50.

Here, such a saving construction is possible. The statute permits distribution to "affected domestic producers." 19 U.S.C. § 1675c(a) (2000). It then defines that term to include "a petitioner or interested party *in support* of the petition." *Id.* § 1675c(b)(1)(A) (2000) (emphasis added). The statute likewise requires the ITC to develop a list of affected domestic producers entitled to a distribution, including "persons that indicate support of the petition

by letter *or through questionnaire response.*" *Id.* § 1675c(d)(1) (2000)
(emphasis added). None of the provisions define what constitutes "support"
warranting a distribution, other than to suggest that such support can be given
through a questionnaire response.[19] While the government insists that the
"support" to which the statute refers is checking a box on the questionnaire
form, in *SKF* this Court observed that manufacturers can "support" a petition
not only through "abstract expression of support," 556 F.3d at 1353, but also
through "litigation support," *id.*, that is, by "supporting a petition *by completing
a questionnaire*," *id.* at 1358 (emphasis added).

Accordingly, the statute is susceptible of a construction that avoids any
constitutional infirmity – it can easily be read to provide distributions to those
producers who support a petition through the act of filling out the questionnaire,
so long as they do not then counteract that support by engaging in other conduct
that actively interferes with or opposes the petition. That reading not only
avoids a very serious constitutional objection to the statute, but also is
consistent with the statutory purpose this Court identified in *SKF*, which was

---

[19] The statute also indicates that support can be given through a letter
alone, but *SKF* correctly held that this portion of the statute is unenforceable
under the First Amendment. *See* 556 F.3d at 1353 n.26.

not to reward or disfavor speech, but to "reward injured parties who assisted government enforcement of antidumping laws." 556 F.3d at 1352. Here, Ashley has provided as much practical assistance to the enforcement of the nation's trade laws as many other companies entitled to a distribution (*e.g.*, those that simply filled out the questionnaire and indicated abstract support). Distributing duties to Ashley would therefore be consistent with the basic purposes of the statute, the Court's holding in *SKF*, and the requirements of the First Amendment.

# CONCLUSION

For the foregoing reasons, the judgment of the CIT should be reversed.

Respectfully submitted,

Kevin K. Russell
GOLDSTEIN & RUSSELL, P.C.
5225 Wisconsin Ave., NW, Ste. 404
Washington, D.C. 20015
(202) 362-0636

Kristin H. Mowry
Jeffrey S. Grimson
Jill A. Cramer
Susan Lehman Brooks
Sarah M. Wyss
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Ste. 810
Washington, DC 20015

*Counsel to Ashley Furniture Indus., Inc.*

April 16, 2012

65

**ADDENDUM**

Slip Op. 12-14

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **ASHLEY FURNITURE INDUSTRIES, INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendants,<br><br>and<br><br>**AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE, KINCAID FURNITURE CO., INC., L. & J.G. STICKLEY, INC., SANDBERG FURNITURE MANUFACTURING COMPANY, INC., STANLEY FURNITURE COMPANY, INC., T. COPELAND AND SONS, INC., and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,**<br><br>Defendant-Intervenors. | **Before:** Gregory W. Carman, Judge<br>Timothy C. Stanceu, Judge<br>Leo M. Gordon, Judge<br><br>**Consol. Court No. 07-00323** |

## OPINION

[Dismissing the action for failure to state a claim upon which relief can be granted]

Dated: January 31, 2012

*Kristen H. Mowry*, *Jeffrey S. Grimson*, *Jill A. Cramer*, *Susan E. Lehman*, and *Sarah Wyss*, Mowry & Grimson, PLLC, of Washington, DC and *Kevin Russell*, Goldstein, Howe & Russell, P.C., of Bethesda, MD, for plaintiff.

*Jessica R. Toplin*, *David S. Silverbrand*, and *Courtney S. McNamara*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant United States. With them on the briefs were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel on the briefs were *Andrew G. Jones* and *Joseph Barbato*, Office of Assistant Chief Counsel, U.S. Customs and Border Protection, of New York, NY.

*Patrick V. Gallagher, Jr.*, Attorney Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, for defendant U.S. International Trade Commission. With him on the briefs were *James M. Lyons*, General Counsel, and *Neal J. Reynolds*, Assistant General Counsel.

*Jeffrey M. Telep, Joseph W. Dorn, Taryn Koball Williams*, and *Steven R. Keener*, King & Spalding LLP, of Washington, DC, for defendant-intervenors the American Furniture Manufacturers Committee for Legal Trade, Kincaid Furniture Co., Inc., L. & J.G. Stickley, Inc., Sandberg Furniture Manufacturing Company, Inc., Stanley Furniture Co., Inc., T. Copeland and Sons, Inc., and Vaughan-Bassett Furniture Company, Inc.

Stanceu, Judge: Plaintiff Ashley Furniture Industries, Inc. ("Ashley"), a domestic furniture manufacturer, brought three similar actions (now consolidated)[1] during the period of September 4, 2007 through March 4, 2010, all stemming from certain administrative determinations of the U.S. International Trade Commission ("ITC" or the "Commission") and U.S. Customs and Border Protection ("Customs" or "CBP"). The ITC denied Ashley status as an "affected domestic producer" ("ADP") under the Continued Dumping and Subsidy Offset Act of 2000 (the "CDSOA" or "Byrd Amendment"), Pub. L. No. 106-387, §§ 1001-03, 114 Stat. 1549, 1549A-72-75 (codified at 19 U.S.C. § 1675c (2000)),[2] *repealed by* Deficit Reduction Act of 2005, Pub. L. 109-171, § 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006; effective Oct. 1, 2007). ADP status potentially would have qualified Ashley for annual monetary distributions by Customs of antidumping duties collected under an antidumping duty order on imports of wooden bedroom

---

[1] Due to the presence of common issues, the court, on February 15, 2011, consolidated plaintiff's three actions under Consol. Court No. 07-00323. Order (Feb. 15, 2011), ECF No. 51. Consolidated with *Ashley Furniture Industries, Inc. v. United States* under Consol. Court No. 07-00323 are *Ashley Furniture Industries, Inc. v. United States*, Court No. 09-00025 and *Ashley Furniture Industries, Inc. v. United States*, Court No. 10-00081.

[2] Citations are to the codified version of the Continued Dumping and Subsidy Offset Act ("CDSOA"), 19 U.S.C. § 1675c (2000). All other citations to the United States Code are to the 2006 edition.

furniture from the People's Republic of China. *Notice of Amended Final Determination of Sales at Less Than Fair Value & Antidumping Duty Order: Wooden Bedroom Furniture From the People's Republic of China*, 70 Fed. Reg. 329 (Jan. 4, 2005) ("*Antidumping Duty Order*"). The ITC construed the "petition support requirement" of the CDSOA, under which distributions are limited to petitioners and parties in support of a petition, to disqualify Ashley from ADP status because Ashley indicated to the ITC that it opposed the antidumping duty petition on Chinese wooden bedroom furniture.

Plaintiff claims that the administrative actions of the two agencies were inconsistent with the CDSOA, were not supported by substantial evidence, and were otherwise not in accordance with law. Plaintiff also brings constitutional challenges grounded in the First Amendment, the Fifth Amendment equal protection guarantee, and the Fifth Amendment due process guarantee.

Before the court is Ashley's motion for a preliminary injunction, filed January 11, 2012. Pl.'s Mot. for Prelim. Inj. (Jan 11, 2012), ECF No. 95. Ashley seeks to halt, pending a final disposition of this litigation, including all appeals and remands, CBP's pending distribution of certain collected antidumping duties to domestic parties recognized as ADPs by the Commission, including the defendant-intervenors in this case. *Id.* at 1. The distribution was scheduled to occur on or after January 31, 2012.[3] Def. U.S. Customs & Border Protection's Resp. to the Ct.'s Feb. 14, 2011 Request (Feb. 28, 2011), ECF No. 60. Customs withheld these funds from distribution pending the resolution of various lawsuits, including plaintiff's, challenging the constitutionality of the CDSOA.

_____

[3] Defendants represent that distribution is now scheduled to take place on or after March 9, 2012. Def.'s Mot. for an Extension of Time for all Defs. to File Their Resps. in Opp'n to Pl.'s Mot. for Prelim. Inj. 2 (Jan. 19, 2012), ECF No. 97.

Also before the court are three motions to dismiss under USCIT Rule 12(b)(5) for failure to state a claim upon which relief can be granted. Defendant-intervenors American Furniture Manufacturers Committee for Legal Trade, Kincaid Furniture Co., Inc., L. & J.G. Stickley, Inc., Sandberg Furniture Manufacturing Company, Inc., Stanley Furniture Co., Inc., T. Copeland and Sons, Inc., and Vaughan-Bassett Furniture Company, Inc. moved under Rules 12(b)(5), and also Rule 12(c), on February 23, 2011. Def.-intervenors' Mot. to Dismiss & for J. on the Pleadings (Feb. 23, 2011), ECF No. 55 ("Def.-intervenors' Mot."). Defendants ITC and Customs moved to dismiss under Rule 12(b)(5) on May 2, 2011. Def. U.S. Int'l Trade Comm'n's Mot. to Dismiss for Failure to State a Claim (May 2, 2011), ECF No. 80 ("ITC's Mot."); Def. U.S. Customs & Border Protection's Mot. to Dismiss for Failure to State a Claim (May 2, 2011), ECF No. 81 ("Customs' Mot.").

The court rules that plaintiff does not satisfy the standards for obtaining the injunction it seeks. The court concludes that relief is not available on plaintiff's claims challenging the administration of the CDSOA by the two agencies. We also conclude that no relief can be granted on Ashley's claims challenging the CDSOA on First Amendment and Fifth Amendment equal protection grounds. Plaintiff lacks standing to assert the claims it bases on Fifth Amendment due process grounds. The court will enter judgment dismissing this action.

## I. BACKGROUND

During a 2003 ITC investigation to determine whether imports of wooden bedroom furniture from China were causing or threatening to cause material injury to the domestic industry, *Initiation of Antidumping Duty Investigation: Wooden Bedroom Furniture from the People's Republic of China*, 68 Fed. Reg. 70,228, 70,231 (Dec. 17, 2003), Ashley responded to

the ITC's questionnaires, indicating that it opposed the issuance of an antidumping duty order.

*See, e.g.*, First Amended Compl. ¶ 19 (Feb. 9, 2011), ECF No. 50. Based on the affirmative ITC

injury determination, the International Trade Administration, U.S. Department of Commerce

("Commerce" or the "Department") issued the antidumping duty order on imports of wooden

bedroom furniture from China in 2005. *Antidumping Duty Order*, 70 Fed. Reg. at 329.

Determining that Ashley did not qualify for CDSOA benefits, ITC declined to designate Ashley

an ADP with respect to this order for Fiscal Years 2007 through 2010. *Distribution of Continued*

*Dumping & Subsidy Offset to Affected Domestic Producers*, 72 Fed. Reg. 29,582, 29,622-23

(May 29, 2007); *Distribution of Continued Dumping & Subsidy Offset to Affected Domestic*

*Producers*, 73 Fed. Reg. 31,196, 31,236-37 (May 30, 2008); *Distribution of Continued Dumping*

*& Subsidy Offset to Affected Domestic Producers*, 74 Fed. Reg. 25,814, 25,855-56

(May 29, 2009); *Distribution of Continued Dumping & Subsidy Offset to Affected Domestic*

*Producers*, 75 Fed. Reg. 30,530, 30,571-72 (June 1, 2010).

Plaintiff filed actions contesting the government's refusal to provide it CDSOA

distributions of antidumping duties collected during Fiscal Years 2007 (Court No. 07-00323),

2008 (Court No. 09-00025), and 2009-2010 (Court No. 10-00081). The court stayed the three

actions pending a final resolution of other litigation raising the same or similar issues.[4] *See, e.g.*,

Order (Oct. 23, 2007), ECF No. 13.

Following the decision of the U.S. Court of Appeals for the Federal Circuit ("Court of

Appeals") in *SKF USA Inc. v. United States*, 556 F.3d 1337 (2009) ("*SKF*"), *cert. denied*, 130 S.

---

[4] The court's order stayed the action "until final resolution of *Pat Huval Restaurant & Oyster Bar, Inc. v. United States International Trade Commission*, Consol. Court No. 06-00290, that is, when all appeals have been exhausted." Order (Oct. 23, 2007), ECF No. 13.

Ct. 3273 (2010), which addressed legal questions that are also present in this case, the court

issued an order directing Ashley to show why these actions should not be dismissed and lifted the

stay for the purposes of allowing any brief, response, or reply described in that order. *See, e.g.*,

Order (Jan. 3, 2011), ECF No. 38. On January 24, 2011, plaintiff responded to the court's order

and moved for a partial lift of the stay to allow amendment of the complaints as a matter of

course to add an additional count challenging the CDSOA under the First Amendment as applied

to Ashley. Mot. for Partial Lifting of Stay (Jan. 24, 2011), ECF No. 39; Mot. for Partial Lifting

of Stay (Jan. 24, 2011), ECF No. 23 (Court No. 09-00025); Mot. for Partial Lifting of Stay

(Jan. 24, 2011), ECF No. 21 (Court No. 10-00081).

 The court lifted the stay for all purposes on February 9, 2011. *See, e.g.*, Order

(Feb. 9, 2011), ECF No. 45. The same day, plaintiff filed notices of amended complaints in all

three cases. First Amended Compl.; First Amended Compl., ECF No. 32 (Court No. 09-00025);

First Amended Compl., ECF No. 30 (Court No. 10-00081). Defendant-intervenors filed their

motion to dismiss and for judgment on the pleadings on February 23, 2011. Def.-Intervenors'

Mot. The ITC and Customs filed their motions to dismiss on May 2, 2011. ITC's Mot.;

Customs' Mot.

 In July 2011, plaintiff filed a notice of supplemental authority highlighting recent

decisions by the U.S. Supreme Court, which, according to plaintiff, are "relevant to the pending

motions to dismiss Ashley's as-applied First Amendment challenge to the government's

implementation of the [CDSOA]." Notice of Supp. Authority 1 (July 7, 2011), ECF No. 90

("Pl.'s Notice of Supp. Authority") (citing *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011);

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2086 (2011); *Citizens*

*United v. Federal Election Comm'n,,* 130 S. Ct. 876 (2010)).  Defendants addressed the

supplemental authority question in their reply briefs and defendant-intervenors filed a letter in

reply.  United States & U.S. Customs & Border Protection's Reply in Supp. of their Mot. to

Dismiss for Failure to State a Claim (July 14, 2011), ECF No. 92; Def. U.S. Int'l Trade

Comm'n's Reply to Pl.'s Br. in Opp'n to Mot. to Dismiss for Failure to State a Claim

(July 14, 2011), ECF No. 93; Def.-intervenor's Resp. to Pl.'s Notice of Supplemental Authority

(July 22, 2011), ECF No. 94.

Ashley filed its motion for a preliminary injunction on January 11, 2012, seeking to

prevent the pending CBP distribution.  Pl.'s Mot. for Prelim. Inj.; Pl.'s Mem. of Points &

Authorities in Supp. of Mot. for Prelim. Inj. (Jan. 11, 2012), ECF No. 95.

## II. DISCUSSION

The court exercises jurisdiction over this action according to section 201 of the Customs

Courts Act of 1980, 28 U.S.C. § 1581(i)(4), which provides the Court of International Trade

jurisdiction of civil actions arising out of any law of the United States, such as the CDSOA,

providing for administration with respect to duties (including antidumping duties) on the

importation of merchandise for reasons other than the raising of revenue.  *See Furniture Brands

Int'l v. United States*, 35 CIT __, __, Slip Op. 11-132, at 9-15 (Oct. 20, 2011) ("*Furniture

Brands*").

The CDSOA amended the Tariff Act of 1930 ("Tariff Act") to provide for the distribution

of funds from assessed antidumping and countervailing duties to persons with ADP status, which

is limited to petitioners, and interested parties in support of petitions, with respect to which

antidumping duty and countervailing duty orders are entered.[5] 19 U.S.C. § 1675c(a)-(d).[6]

The statute directed the ITC to forward to Customs, within sixty days after an antidumping or

countervailing duty order is issued, lists of "petitioners and persons with respect to each order

and finding and a list of persons that indicate support of the petition by letter or through

questionnaire response." *Id.* § 1675c(d)(1).[7] The CDSOA directed Customs to publish in the

Federal Register lists of ADPs potentially eligible for distributions of a "continuing dumping and

subsidy offset" that are based on the lists obtained from the Commission. *Id.* § 1675c(d)(2). The

CDSOA also directed Customs to segregate antidumping and countervailing duties according to

the relevant antidumping or countervailing duty order, to maintain these duties in special

---

[5] Congress repealed the CDSOA in 2006, but the repealing legislation provided that "[a]ll duties on entries of goods made and filed before October 1, 2007, that would [but for the legislation repealing the CDSOA], be distributed under [the CDSOA] . . . shall be distributed as if [the CDSOA] . . . had not been repealed . . . ." Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601(b), 120 Stat. 4, 154 (2006). In 2010, Congress further limited CDSOA distributions by prohibiting payments with respect to entries of goods that as of December 8, 2010 were "(1) unliquidated; and (2)(A) not in litigation; or (B) not under an order of liquidation from the Department of Commerce." Claims Resolution Act of 2010, Pub. L. No. 111-291, § 822, 124 Stat. 3064, 3163 (2010).

[6] The CDSOA provided that:
The term "affected domestic producer" means any manufacturer, producer, farmer, rancher or worker representative (including associations of such persons) that
(A) was a petitioner *or interested party in support of the petition* with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and
(B) remains in operation.
19 U.S.C. § 1675c(b)(1) (emphasis added).

[7] Additionally, the CDSOA directed the U.S. International Trade Commission to forward to U.S. Customs and Border Protection a list identifying affected domestic producers "within 60 days after the effective date of this section in the case of orders or findings in effect on January 1, 1999 . . . ." 19 U.S.C. § 1675c(d)(1). The antidumping duty order at issue in this case was not in effect on that date.

accounts, and to distribute to an ADP annually, as reimbursement for incurred qualifying

expenditures, a ratable share of the funds (including all interest earned) from duties assessed on a

specific unfairly traded product that were received in the preceding fiscal year. *Id.*

§ 1675c(d)(3), (e).

In February 2009, approximately one and a half years after plaintiff filed suit, the Court of

Appeals decided *SKF*, upholding the CDSOA against constitutional challenges brought on First

Amendment and Fifth Amendment equal protection grounds. 556 F.3d at 1360. *SKF* reversed

the decision of the Court of International Trade in *SKF USA Inc. v. United States*, 30 CIT 1433,

451 F. Supp. 2d 1355 (2006), which held the petition support requirement of the CDSOA

unconstitutional on Fifth Amendment equal protection grounds.

We address below plaintiff's motion for an injunction and the motions to dismiss, basing

our rulings on the claims stated in plaintiff's First Amended Complaints.[8] In Count 1 of the

amended complaints, plaintiff claims that defendants' actions were unlawful under the CDSOA

---

[8] In its motions to partially lift the stay on February 1, 2011, plaintiff asserted a right to amend its complaints as a matter of course because "[d]efendant has not yet filed its answer nor has it filed a motion to dismiss under Rule 12(b), (e), or (f)." *See, e.g.*, Mot. For Partial Lifting of Stay (Jan. 24, 2011), ECF No. 39. Under the current Rules of this Court, "a party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." USCIT R. 15(a) (effective Jan. 1, 2011). Under the previous Rule 15(a), a party could amend its pleading "before being served with a responsive pleading." Because plaintiff filed its notices of amended complaints just over one month after the effective date of the change in Rule 15(a), and because the other parties to this case have addressed the complaint in amended form in their dispositive motions, the court exercises its discretion under USCIT Rule 89 to accept plaintiff's First Amended Complaints. USCIT R. 89 ("These rules and any amendments take effect at the time specified by the court. They govern: . . . proceedings after that date in a case then pending unless: (A) the court specifies otherwise").

and not supported by substantial evidence. First Amended Compl. ¶¶ 39-40.[9] In Counts 2 and 5,

plaintiff challenges the "in support of the petition" requirement of the CDSOA ("petition support

requirement") on constitutional First Amendment grounds. *Id.* ¶¶ 41-43, 49-50. In Count 3,

plaintiff brings a challenge to the petition support requirement on Fifth Amendment equal

protection grounds. *Id.* ¶¶ 44-46. In Count 4, plaintiff challenges the petition support

requirement on Fifth Amendment due process grounds, claiming that the CDSOA is

impermissibly retroactive. *Id.* ¶¶ 47-48.

## A. Plaintiff's Motion for an Injunction Will Be Denied

Plaintiff's January 11, 2012, motion seeks what plaintiff terms a "preliminary injunction"

under which defendants would be enjoined from disbursing any funds "that are currently being

withheld by CBP for Ashley for FY2007-FY2010 . . . for the pendency of this litigation,

including all relevant appeals and remands, until such time as a final court decision is rendered in

this case." Pl.'s Mot. for Prelim. Inj. 1. A preliminary injunction normally dissolves upon the

entry of judgment. *See Fundicao Tupy S.A. v. United States*, 841 F.2d 1101, 1103 (Fed. Cir.

1988) ("[A]lthough a preliminary injunction is usually not subject to a fixed time limitation, it is

*ipso facto* dissolved by a dismissal of the complaint or the entry of a final decree in the cause.")

(internal quotation marks omitted); 11A Charles A. Wright, Arthur R. Miller & Mary K. Kane,

Federal Practice and Procedure, § 2947 (2d ed. 2010) (the principal purpose of preliminary

injunctive relief is to preserve the court's power to render a meaningful decision pursuant to a

---

[9] Plaintiff's three First Amended Complaints are essentially identical but directed to CDSOA distributions for the different Fiscal Years, *i.e.*, 2007, 2008, 2009, and 2010. In its citations to the claims in this consolidated action, the court will cite to the First Amended Complaint as filed in *Ashley Furniture Industries, Inc. v. United States*, Court No. 07-00323.

trial on the merits). Because our decision today will conclude this action, the question of a

preliminary injunction to prevent irreparable harm during the pendency of this case is moot.

By attempting to enjoin distribution through all remands and appeals, plaintiff's

January 11, 2012 motion seeks equitable relief beyond a preliminary injunction. Additionally,

plaintiff seeks as a remedy that the court order the ITC to declare Ashley an ADP and order

Customs to "disburse to Ashley pursuant to the CDSOA a pro rata portion of the assessed

antidumping duties on wooden bedroom furniture from China . . . ." First Amended Compl. ¶ 51

(Prayer for Relief). In summary, Ashley seeks to prevent Customs from paying to other CDSOA

claimants what Ashley claims is its share of the withheld distributions and seeks affirmative

injunctions against both agencies so that Ashley will receive those distributions. In these

respects, plaintiff is seeking permanent equitable relief both as a provisional measure pending a

possible appeal and as a remedy on its claims. We conclude, however, that Ashley does not

qualify for permanent equitable relief.

Ashley is required to show for a permanent injunction that it has suffered an irreparable

injury, that the remedies available at law are inadequate to compensate for that injury, that,

considering the balance of hardships between the parties, a remedy in equity is warranted, and

that the public interest would not be disserved by a permanent injunction. *Ebay Inc. v.

Mercexchange, L.L.C.*, 547 U.S. 388, 391 (2006). Here, we conclude that there are no "remedies

available at law" and that no "remedy in equity is warranted," based on our analysis of plaintiff's

claims. We presume, without deciding, that plaintiff would be irreparably harmed were Customs

to distribute to other parties what Ashley claims is its share of the withheld distributions. With

respect to the balance of hardships, Ashley would be prejudiced by such a distribution, but

defendant-intervenors also will be prejudiced by further delay in obtaining what they claim to be

their lawful CDSOA disbursements. The public interest favors an orderly and lawful distribution

of the withheld funds. But even if we presume that the factors of irreparable harm, balance of

hardships, and public interest are in plaintiff's favor, we still conclude that an injunction is

unwarranted. The controlling factor is that neither a remedy at law nor a remedy in equity is

appropriate in the circumstances of this case. For the reasons discussed in this opinion, we

conclude that the appropriate disposition is the dismissal of this action.

B.  No Relief Can Be Granted on the Claims in Counts 1, 2, 3, and 5 of the Amended Complaints

In ruling on motions to dismiss made under USCIT Rule 12(b)(5), we dismiss complaints

that do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic

Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For the reasons discussed below, we conclude

that plaintiff has failed to plead facts on which we could conclude that it could obtain a remedy

on any of the claims asserted in Counts 1, 2, 3, and 5 of the amended complaints. In brief

summary, plaintiff's claims that the actions by the two agencies were not supported by

substantial evidence and were otherwise not in accordance with law must be dismissed because

Ashley admits a fact establishing its disqualification from receiving CDSOA distributions and

presents no other facts from which the court reach a conclusion that those actions must be set

aside. Relief on Ashley's constitutional claims under the First Amendment and the equal

protection guarantee of the Fifth Amendment is foreclosed by the binding precedent established

by *SKF*, which upheld the CDSOA against constitutional challenges brought on First

Amendment and equal protection grounds. In the following, we address Counts 1 through 3, and Count 5, in further detail.[10]

### 1. Count 1 Fails to State a Claim upon which Relief Can Be Granted

In Count 1, plaintiff claims that "[t]he Commission's determination not to include Ashley on its list of affected domestic producers for the antidumping order covering wooden bedroom furniture from China and Customs' failure to accept Ashley's . . . CDSOA Certification[s] for distributions, were not supported by substantial evidence and were otherwise not in accordance with law." First Amended Compl. ¶¶ 39-40. We conclude that Count 1 fails to state a claim upon which relief can be granted and, therefore, must be dismissed.

Plaintiff alleges that "[d]uring the injury phase of the antidumping investigation covering wooden bedroom furniture from China, Ashley filed timely and complete questionnaire responses to the Commission's domestic producer and importer questionnaires." *Id.* ¶ 19. The CDSOA language pertinent to the issue raised by Count 1 is the directive that the ITC, in providing its lists to Customs, include "a list of persons that *indicate support of the petition* by letter or through questionnaire response." 19 U.S.C. § 1675c(d)(1) (emphasis added). Ashley's filing of questionnaire responses without an indication of support for the petition does not satisfy the petition support requirement. Moreover, plaintiff admits that "[in] its questionnaire responses, Ashley indicated that it opposed the petition." First Amended Compl. ¶ 19. Doing so disqualified Ashley from receiving CDSOA distributions.

---

[10] Although relief on the Fifth Amendment due process claims that plaintiff bases on retroactivity, which are stated in Count 4 of its amended complaints, is not foreclosed by binding precedent, we conclude in Part II(C) of this opinion that Ashley has no standing to bring these claims.

In opposing dismissal of Count 1, plaintiff argues that "[in] *SKF*, the Federal Circuit

adopted a saving construction of the CDSOA that could otherwise have violated the First

Amendment by conditioning receipt of CDSOA payments on the content of a domestic

producer's speech." Pl.'s Resp. to Def.'s May 2, 2011 Mot. to Dismiss 9 (Jun. 6, 2011), ECF

No. 86 ("Pl.'s Resp."). Plaintiff submits that, due to this saving construction, *SKF* does not

support dismissal here but rather "makes clear that Ashley is entitled to disbursements under the

statute, constitutionally construed." *Id.* (footnote omitted). Plaintiff views *SKF* to hold "that the

CDSOA 'only permit[s] distributions to those who actively supported the petition (i.e., a party

that did no more than submit a bare statement that it was a supporter without answering

questionnaires or otherwise actively participating would not receive distributions).'" *Id.* at 10

(quoting *SKF*, 556 F.3d at 1353 n.26) (alteration in original). Under this saving construction,

plaintiff argues, SKF USA Inc. ("SKF"), the plaintiff in *SKF*, "was ineligible to receive

distributions *not* because it opposed the petition in its responses to the ITC questionnaire, but

rather because it *actively opposed* the petition in other concrete ways that placed it in 'a role that

was nearly indistinguishable from that played by a defendant in a qui tam or attorney's fees

award case.'" *Id.* at 11 (quoting *SKF*, 556 F.3d at 1358). According to plaintiff, "[in] light of

this substantial opposition, the First Amendment did not bar denying [SKF] a share in

antidumping duties" but "compels the opposite result" in this case because, "[by] contrast,

Ashley took no similar steps to 'impede the investigation,' nor did it express a 'refus[al] to

cooperate' with the Government." *Id.* at 11-12 (quoting *SKF*, 556 F.3d at 1359) (second

alteration in original).

Plaintiff's argument is based on an incorrect understanding of the holding in *SKF*. The Court of Appeals did not construe the CDSOA such that a domestic producer may express opposition to a petition in its ITC questionnaire response and still be eligible to receive CDSOA distributions, so long as the producer does not take additional steps that amount to "substantial opposition" to the petition. The opinion in *SKF* recounts the various steps SKF took in opposing an antidumping duty order that were beyond merely indicating opposition to the petition on a questionnaire response, but it did so in the context of explaining why it considered the petition support requirement not to be overly broad, and therefore permissible, under the test established by *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y*, 447 U.S. 557, 566 (1980). *SKF*, 556 F.3d at 1357-59. The Court of Appeals reasoned that in enacting the petition support requirement Congress permissibly, and rationally, could conclude that those who did not support a petition should not be rewarded. *Id.* at 1357, 1359.

Defendants' determinations denying benefits to Ashley comported with the CDSOA. Therefore, plaintiff's claims that either or both of the agencies acted unlawfully are meritless.

## 2. Relief on Plaintiff's First Amendment Claims Is Foreclosed by Binding Precedent

In Count 2 of the First Amended Complaints, plaintiff claims that the petition support requirement "violates the First Amendment to the Constitution." First Amended Compl. ¶ 42. Ashley claims, specifically, that "[d]efendants' application of the [CDSOA] conditions receipt of a government benefit on a private speaker['s] expressing a specific viewpoint  support for an antidumping petition  and, therefore, is viewpoint discrimination in contravention of the First Amendment." *Id.* ¶ 43. Count 5 of plaintiff's First Amended Complaints contains an as-applied challenge to the CDSOA that plaintiff also bases on the First Amendment. *Id.* ¶¶ 49-50.

Plaintiff claims that the CDSOA violates the First Amendment as applied to Ashley "because it discriminates against Ashley based on expression of [Ashley's] views rather than action ([Ashley's] litigation support)." *Id.* ¶ 50.

Relief on Ashley's facial First Amendment claim is precluded by the holding in *SKF*, 556 F.3d at 1360 (holding that the Byrd Amendment is "valid under the First Amendment" because it "is within the constitutional power of Congress to enact, furthers the government's substantial interest in enforcing the trade laws, and is not overly broad."). The holding in *SKF* also forecloses relief on plaintiff's as-applied First Amendment claims. The Court of Appeals held that the CDSOA did not violate constitutional First Amendment principles as applied to SKF, which expressed in its response to the ITC's questionnaire its opposition to the antidumping duty petition involved in that litigation. *See SKF*, 556 F.3d at 1343 (stating that "SKF also responded to the ITC's questionnaire, but stated that it opposed the antidumping petition"). Ashley, like SKF, expressed opposition to the petition in its response to the ITC's questionnaire. Plaintiff fails to plead any facts that would allow the court to conclude, notwithstanding the binding precedent of *SKF*, that the CDSOA was applied to Ashley in a manner contrary to the First Amendment. In all material respects, Ashley's expression of opposition to an antidumping duty petition was equivalent to that of SKF and properly resulted in Ashley's disqualification from receiving distributions under the CDSOA.

In support of its as-applied First Amendment claims, Ashley directs the court's attention to the Supreme Court's decisions in *Snyder v. Phelps*, 131 S. Ct. at 1207 (2011), *Citizens United v. Federal Election Comm'n*, 130 S. Ct. at 876, *Sorrell v. IMS Health, Inc.*, 131 S. Ct. at 2653, and *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. at 2806.

According to plaintiff, these recent decisions have "rendered [the] conclusion of [*SKF*] utterly

untenable . . . Today, it is clear that corporate speech relating to matters such as international

trade and law enforcement is entitled to the strictest First Amendment protection." Pl.'s

Resp. 21. We disagree.

*Snyder v. Phelps* held that members of the Westboro Baptist Church who picketed near

the funeral of a member of the U.S. Marine Corps killed in the line of duty in Iraq could not be

held liable on state-law tort claims alleging intentional infliction of emotional distress, intrusion

upon seclusion, and civil conspiracy. 131 S. Ct. at 1213-14, 1220. Concluding that the various

messages condemning the United States and its military displayed on the picketer's signs were

entitled to "'special protection' under the First Amendment," *id.* at 1219, the Supreme Court held

that the jury verdict holding the Westboro picketers liable on the tort claims must be set aside as

an impermissible burden on protected speech, even if the picketing caused emotional distress to

the mourners, *id.* at 1220. The Supreme Court cautioned that its holding was narrow and limited

to the particular facts before it, having emphasized that the picketers carried signs displaying

messages that, for the most part, constituted speech addressing matters of public concern, *id.* at

1216-17, and conducted their picketing peacefully, and without interfering with the funeral, at

each of three locations the Supreme Court considered to be a public forum, *id.* at 1218-19.

Plaintiff maintains that "[in] light of the Court's decision in *Snyder*, there can be no

dispute that opposition to a government antidumping investigation constitutes speech on a matter

of public concern, subject to full First Amendment protection" and that to the extent that *SKF*

rested on a belief that this opposition does not constitute political speech, "*Snyder* demonstrates

that the Federal Circuit erred." Pl.'s Resp. 22. *Snyder*, however, resolved a First Amendment

question differing from those presented by this case and by *SKF*. Ashley is not asserting First

Amendment rights as a defense against civil liability for an award of monetary damages. The

"burden" the CDSOA placed on Ashley's speech   ineligibility for potential CDSOA

distributions   does not rise to a level commensurate with the burden the Supreme Court

addressed by setting aside the jury verdict against the Westboro picketers. In speaking to a

different First Amendment issue than the one Ashley raises, *Snyder* does not establish a principle

of First Amendment law under which we may invalidate the CDSOA petition support

requirement in response to Ashley's as-applied challenge.

In *Citizens United v. Federal Election Commission*, the Supreme Court struck down a

federal election law imposing an "outright ban, backed by criminal sanctions" on independent

expenditures by a "corporation," including "nonprofit advocacy corporations" or "unions,"

during the thirty-day period preceding a primary election or the sixty-day period preceding a

general election, for an "electioneering communication" or for advocacy of the election or defeat

of a candidate. 130 S. Ct. at 886-87, 897. Reasoning that "political speech must prevail against

laws that would suppress it, whether by design or inadvertence," the Supreme Court concluded

that "[l]aws that burden political speech are 'subject to strict scrutiny,' which requires the

Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored

to achieve that interest.'" *Id.* at 898 (citing *Federal Election Comm'n v. Wisconsin Right to Life,*

*Inc.*, 551 U.S. 449, 464 (2007)).

Ashley argues that the holding in *SKF* cannot stand now that the Supreme Court has

"made perfectly clear that so long as speech relates to matters of public concern, it is entitled to

the highest form of constitutional protection, even if it involves corporations or 'activities of a

commercial nature.'" Pl.'s Resp. 23 (quoting *SKF*, 556 F.3d at 1355). According to plaintiff,

applying a lesser standard of scrutiny to the petition support requirement, as the Court of Appeals

did in *SKF* based on a perceived statutory purpose of rewarding cooperation with the

government, "is incompatible with *Citizens United*." *Id.* Positing that the petition support

requirement as applied to entities like Ashley "is calculated to silence  or at least

discourage  dissent against proposed antidumping actions," plaintiff argues that "[t]his sort of

arm-twisting cannot withstand constitutional scrutiny after *Citizens United*." *Id.* at 24.

 *Citizens United* does not hold that any statute affecting speech relating to matters of

public concern, whether made by individuals or corporations, is to be subjected to a strict

scrutiny standard. The statute struck down in *Citizens United* banned political speech, and the

Supreme Court's decision to apply strict scrutiny can only be viewed properly in that context. As

the Court of Appeals recognized in *SKF*, the CDSOA "does not prohibit particular speech," that

"statutes prohibiting or penalizing speech are rarely sustained," and that "cases addressing the

constitutionality of such statutes are of little assistance in determining the constitutionality of the

far more limited provisions of the Byrd Amendment." 556 F.3d. at 1350. The Court of Appeals

reasoned that "[in] considering limited provisions that do not ban speech entirely, the purpose of

the statute is important," and concluded that "[n]either the background of the statute, nor its

articulated purpose, nor the sparse legislative history supports a conclusion that the purpose of

the Byrd Amendment was to suppress expression." *Id.* at 1350-51. Contrary to this view, Ashley

maintains that "the Supreme Court in *Citizens United* made clear that the degree of First

Amendment protection afforded corporate speech on matters of public concern does not vary

depending on whether the government directly prohibits speech or instead withholds benefits

based on speech." Pl.'s Resp. 24 (citing *Citizens United*, 130 S. Ct. at 905). Thus, plaintiff's

argument would have us consider immaterial the distinction between the CDSOA, which does

not prohibit speech, and the statute struck down in *Citizens United*, which had as its purpose and

effect the suppression of political speech through an "outright ban, backed by criminal

sanctions." *Citizens United*, 130 S. Ct. at 897.

     Plaintiff misreads *Citizens United*. In the passage from the opinion to which plaintiff

directs our attention, the Supreme Court explained that it no longer subscribes to certain

reasoning expressed in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), which

*Citizens United* overturned. *Citizens United* signaled the Court's rejection of the notion that the

special state-law advantages corporations enjoy over wealthy individuals, such as limited

liability, perpetual life, and favorable treatment of accumulation and distribution of assets, can

suffice to allow laws "prohibiting speech," *i.e.*, laws prohibiting corporations from speaking on

matters of public concern. 130 S. Ct. at 905. Plaintiff misconstrues the Supreme Court's

explanation to mean broadly that "[w]hile the government has no obligation to provide those

benefits to corporations, the Court made clear that the government may not condition

corporations' receipt of these benefits on corporations' foregoing full First Amendment

protection for their speech." Pl.'s Resp. 24 (citing *Citizens United*, 130 S. Ct. at 905). Rather,

the Supreme Court was specific in concluding that the granting of benefits to corporations under

state laws "does not suffice, however, to allow laws *prohibiting* speech." *Citizens United*,

130 S. Ct. at 905 (emphasis added). Because the CDSOA is not a prohibitory statute, and

because the relevant purpose of the CDSOA is to reward petitioners and those in support of

petitions, we reject the argument that *Citizens United* implicitly invalidates the *SKF* analysis

upholding the CDSOA against attack on First Amendment grounds.

Plaintiff argues, next, that in the wake of the Supreme Court's decision in *Sorrell*, the

conclusion that intermediate scrutiny should be applied to the CDSOA "despite the CDSOA's

viewpoint discrimination" is a conclusion that "can no longer stand" and that the CDSOA now

must be subjected to "heightened judicial scrutiny." Pl.'s Notice of Supp. Authority 2 (citing

*Sorrell*, 131 S. Ct. at 2663-64). As we did recently in ruling on another First Amendment

challenge to the CDSOA, we reject the argument that *Sorrell* implicitly overturned *SKF*.

*Furniture Brands*, 35 CIT __, __, Slip Op. 11-132, at 23-25.

*Sorrell* struck down a Vermont statute (the "Prescription Confidentiality Law") that

prohibited, subject to certain exceptions, the sale, disclosure, and use of "prescriber-identifying

information," which is information obtained from pharmacy records that reveals the drug

prescribing practices of individual physicians. 131 S. Ct. at 2660 (citation omitted). The statute

prohibited pharmacies, health insurers, and similar entities from selling this information, or

allowing such information to be used for marketing, without the prescriber's consent, and it

prohibited pharmaceutical manufacturers and marketers from using such information for

marketing without the prescriber's consent. *Id.* The statute authorized the Vermont attorney

general to pursue civil remedies against violators. *Id.*

The Supreme Court concluded that the Prescription Confidentiality Law "enacts

content-and speaker-based restrictions on the sale, disclosure, and use of prescriber-identifying

information." *Id.* at 2663. Under the "heightened scrutiny" the Supreme Court considered to be

warranted, "the State must show at least that the statute directly advanced a substantial

government interest and that the measure is drawn to achieve that interest." *Id.* at 2667-68. The

Court concluded that the State of Vermont failed to make that showing. The Court considered

that the stated interest of promoting medical privacy and physician confidentiality did not justify

the prohibitions placed on the sale and use of the information. *Id.* at 2668. The Court noted that

the law allowed wide dissemination of the information but effectively prohibited use of the

information by a class of disfavored speakers ("detailers," who used the prescriber-identifying

information to promote brand-name drugs on behalf of pharmaceutical manufacturers) and in

effect prohibited a disfavored use, marketing. *Id.* Under the Supreme Court's analysis, the

Vermont law "forbids sale" of the information "subject to exceptions based in large part on the

content of a purchaser's speech," disfavors "marketing, that is, speech with a particular content,"

and "disfavors specific speakers, namely, pharmaceutical manufacturers." *Id.* at 2663. Another

purpose the State of Vermont advanced in support of the Prescription Confidentiality

Law  reducing health care costs and promoting public health  also failed to justify the burden on

speech. *Id.* at 2668, 2670. In restraining certain speech by certain speakers, and specifically, in

diminishing the ability of detailers to influence prescription decisions, the statute sought to

influence medical decisions by the impermissible means of keeping physicians from receiving

the disfavored information. *Id.* 2670-71.

     As we observed in our *Furniture Brands* opinion, *Sorrell* and *SKF* analyze dissimilar

statutes, which vary considerably in the nature and degree of the effect on expression as well as

in purpose. *Furniture Brands*, 35 CIT at __, Slip Op. 11-132, at 23. *SKF* concluded that the

CDSOA does not have as a stated purpose, or even an implied purpose, the intentional

suppression of expression, *SKF*, 556 F.3d at 1351-52, whereas the Vermont statute authorized

civil remedies against those selling or using the prescriber-identifying information that the statute

sought to suppress. *See Sorrell*, 131 S. Ct. at 2660. *Sorrell* does not require us to review the

CDSOA according to a First Amendment analysis differing from that applied by the Court of

Appeals in *SKF*. In analyzing the Vermont statute, the Supreme Court stated in *Sorrell* that "the

State must show at least that the statute directly advances a substantial government interest and

that the measure is drawn to achieve that interest." 131 S. Ct. at 2667-68 (citing *Board of

Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480-81 (1989); *Central Hudson*, 447 U.S.

at 566). *SKF* concluded that "SKF's opposition to the antidumping petition is protected First

Amendment activity," 556 F.3d at 1354, and applied a test to which it referred as the "well

established *Central Hudson* test," *id.* at 1355. The Court of Appeals described this test as

requiring that regulation of commercial speech be held permissible if the asserted governmental

interest is substantial, the regulation directly advances that interest, and the regulation is not more

extensive than is necessary to serve that interest. *Id.* (citing *Central Hudson*, 447 U.S. at 566).

We reject plaintiff's argument that *Sorrell* requires us to apply to the CDSOA a level of scrutiny

different from that applied by the Court of Appeals in *SKF*.

     In *Arizona Free Enterprise*, the Supreme Court struck down an Arizona campaign finance

law imposing a "matching funds scheme" that "substantially burdens protected political speech

without serving a compelling state interest and therefore violates the First Amendment." 131 S.

Ct. at 2813. Under the Arizona statute, candidates for state office who agreed to accept public

funding received matching funds when the allotment of state funds to the publicly financed

candidate were exceeded by an amount calculated according to the amount a privately funded

candidate received in contributions (including the candidate's "contribution" of expenditures of

personal funds), combined with the expenditures independent groups made in support of the

privately funded candidate or in opposition to a publicly funded candidate. *Id.* at 2313-14.

According to plaintiff, "the Supreme Court's decision in *Arizona Free Enterprise*

demonstrates that, contrary to the government's position, strict scrutiny applies to viewpoint

discrimination that falls short of an 'outright ban'" and that "[in] *SKF*, the Federal Circuit

declined to apply heightened scrutiny even though the CDSOA has the equivalent effect,

providing a subsidy to the direct economic competitors of those engaging in disfavored speech."

Pl.'s Notice of Supp. Authority 3-4. Therefore, plaintiff argues, *SKF* "is no longer compatible

with Supreme Court precedent." *Id.* at 4.

We do not agree that the Supreme Court's holding in *Arizona Free Enterprise* implicitly

invalidates the holding in *SKF*. *Arizona Free Enterprise* is one of a line of Supreme Court cases

that struck down laws affecting speech during campaigns for political office. That line of cases

includes *Citizens United*, discussed *supra*, and *Davis v. Federal Election Comm'n*, 554 U.S. 724

(2008), which invalidated a federal statute under which a new, asymmetrical regulatory scheme of

limits on campaign donations of individuals in elections for the U.S. House of Representatives

was triggered when one candidate in such an election spent more than $350,000 of personal

funds on the race. *Arizona Free Enterprise*, 131 S. Ct. at 2818. The Supreme Court grounded its

reasoning in *Arizona Free Enterprise* partly on the principle that "the First Amendment 'has its

fullest and most urgent application' to speech uttered during a campaign for political office." *Id.*

(quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989))

(internal quotation marks omitted). Stating in *Arizona Free Enterprise* that "[t]he logic of *Davis*

largely controls our approach to this case," the Supreme Court found the burdens the Arizona law

imposed on speech uttered during a campaign to impose an even more onerous penalty on the

free speech of a privately funded candidate than did the federal statute invalidated in *Davis* and to

inflict a penalty on groups making or desiring to make independent expenditures. *Id.* at 2818-20.

Under the Arizona law's scheme, "[t]he direct result of the speech of privately financed

candidates and independent expenditure groups is a state-provided monetary subsidy to a

political rival." *Id.* at 2821. Contrary to plaintiff's argument, the CDSOA does not bear more

than a superficial resemblance to the laws invalidated in *Arizona Free Enterprise*, *Davis* (a case

decided prior to *SKF*), and similar such cases, which regulated and impermissibly burdened

political speech during an election by restricting campaign expenditures. Accordingly, we reject

Ashley's contention that *Arizona Free Enterprise* established a new First Amendment principle

requiring us to disregard the holding in *SKF* and to apply a strict scrutiny analysis to the CDSOA.

In summary, *SKF* remains binding precedent that is controlling on the disposition of

plaintiff's as-applied First Amendment claims. These claims must be dismissed according to

USCIT Rule 12(b)(5).

### 3. Relief on Plaintiff's Equal Protection Claims Is Foreclosed by Precedent

In Count 3 of the amended complaints, plaintiff claims that the petition support

requirement of the CDSOA "violates the Equal Protection Clause of the Constitution because

Defendants have created a classification that implicates Ashley's fundamental right of speech and

Defendants' actions are not narrowly tailored to a compelling government objective." First

Amended Compl. ¶ 45. Count 3 claims, further, that defendants' application of the CDSOA to

Ashley "also violates the Equal Protection Clause because it impermissibly discriminates

between Ashley and other domestic parties who expressed support for the relevant antidumping

petition, denying a benefit to Ashley." *Id.* ¶ 46.

Relief on these claims is foreclosed by the holding in *SKF*. The Court of Appeals held in

*SKF* that the CDSOA did not violate equal protection principles as applied to plaintiff SKF.

Ashley, like SKF, expressed opposition to the relevant antidumping duty petition and thus failed

to satisfy the petition support requirement, 19 U.S.C. § 1675c(d)(1). *Compare* First Amended

Compl. ¶ 19 ("In its questionnaire responses, Ashley indicated that it opposed the petition.") *with*

*SKF*, 556 F.3d at 1343 ("SKF also responded to the ITC's questionnaire, but stated that it

opposed the antidumping petition."). Plaintiff points out that SKF "did much more than simply

express abstract opposition to the petition," Pl.'s Resp. 13, but this fact does not distinguish the

holding in *SKF* from the case before us. In ruling on claims that are not distinguishable from

Ashley's in any material way, the Court of Appeals held that "[b]ecause it serves a substantial

government interest, the Byrd Amendment is . . . clearly not violative of equal protection under

the rational basis standard," *SKF*, 556 F.3d at 1360, and that "the Byrd Amendment does not fail

the equal protection review applicable to statutes that disadvantage protected speech," *id.*

at 1360 n.38.

Because plaintiff fails to plead facts allowing the court to conclude that its equal

protection claims are distinguishable from those brought, and rejected, in *SKF*, Count 3 must be

dismissed for failure to state a claim upon which relief can be granted.

## C.  Plaintiff Lacks Standing to Bring a Fifth Amendment Retroactivity Challenge to the CDSOA

Count 4 of the amended complaints challenges the CDSOA under the Due Process

guarantee of the Fifth Amendment on the ground that the statute is impermissibly retroactive.

Plaintiff claims that the petition support requirement of the CDSOA "violates the Due Process

Clause of the Constitution because Defendants base Ashley's eligibility for disbursements on

past conduct (*i.e.*, support for a petition)." First Amended Compl. ¶ 48. According to Count 4,

"[t]he Due Process Clause disfavors retroactive legislation, and Defendants' disbursements only

to those companies that express support for a petition is not rationally related to a legitimate

government purpose." *Id.*

    We construe Ashley's retroactivity claims, which are vaguely stated, to mean that the

CDSOA is impermissibly retroactive under the Fifth Amendment due process guarantee because

it conditions the receipt of distributions on a decision whether or not to support an antidumping

duty petition that was made before the statute went into effect, and thus before the affected party

making that decision could have had notice of the consequences. *See* 19 U.S.C. § 1675c(d)(1)

(directing the ITC to forward to Customs a list identifying petitioners and parties expressing

support for a petition "within 60 days after the effective date of this section in the case of orders

or findings in effect on January 1, 1999 . . . . "). Because it applies to petition support decisions

made prior to enactment, the CDSOA may be characterized as having a retroactive aspect. *See*

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994) (considering a retroactive statute to be

one that attaches "new legal consequences to events completed before its enactment"). We

previously have concluded that the CDSOA is not violative of the due process guarantee because

"the retroactive reach of the petition support requirement in the CDSOA is justified by a rational

legislative purpose and therefore is not vulnerable to attack on constitutional due process

grounds." *New Hampshire Ball Bearing Co., Inc. v. United States*, 36 CIT __, __, Slip Op. 12-2,

at 14 (Jan. 3, 2012); *see also Schaeffler Grp. USA, Inc. v. United States*, 36 CIT __, __, Slip

Op. 12-8, at 11-12 (Jan. 17, 2012). We conclude that Ashley's retroactivity claims, when

construed in this way, must be dismissed for lack of standing.[11] Because the CDSOA was

enacted in 2000, it was not applied retroactively to Ashley, which expressed opposition to the

wooden bedroom furniture petition in 2003. First Amended Comp. ¶¶ 18-19. Ashley, therefore,

had the "opportunity to . . . conform [its] conduct accordingly." *Landgraf*, 511 U.S. at 265. As a

consequence, plaintiff's amended complaints fail to allege an injury in fact arising from conduct

predating the CDSOA's enactment. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,

528 U.S. 167, 180-81 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) ("To

satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in

fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

hypothetical . . .").

Because the amended complaints do not allege facts from which we may conclude that

Ashley has standing to bring the claims stated as Count 4, we must dismiss these claims for lack

of jurisdiction pursuant to USCIT Rule 12(b)(1).

---

[11] It is also possible to construe Ashley's retroactivity claims, when read literally, to mean that the CDSOA is impermissibly retroactive under the due process guarantee simply because it attaches negative consequences to petition support decisions made prior to the determination of eligibility for distributions. We decline to construe the claims in this way because, according to such a construction, the CDSOA would not be "retroactive" as the term has been recognized in case law and would be indistinguishable from any of innumerable statutes attaching a consequence to a past action of a person to whom enactment of the statute provided notice of the consequences. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."). Were we to adopt the alternate construction of plaintiff's retroactivity claims that we pose hypothetically, we would be compelled to dismiss such claims as ones upon which no relief could be granted.

Consol. Court No. 07-00323                                    Page 29

### III. CONCLUSION

Because neither a remedy at law nor a remedy in equity is available on the claims stated in Counts 1, 2, 3, and 5 of the amended complaints, and because the claims in Count 4 of the amended complaints must be dismissed for lack of standing, we conclude that plaintiff is not entitled to injunctive relief that would delay the pending CBP distribution of CDSOA funds or to an affirmative injunction directing distribution of CDSOA benefits to Ashley. For the same reasons, we will grant the motions to dismiss filed by defendants and defendant-intervenors. Plaintiff already has taken the opportunity to amend its original complaints and has not indicated an intention to seek leave to amend its complaints again, and we see no reason why this action should be prolonged. Accordingly, we shall enter judgment dismissing this action.

                                        /s/ Timothy C. Stanceu
                                        Timothy C. Stanceu
                                        Judge

Dated: January 31, 2012
       New York, New York

JA000029

CERTIFICATE OF SERVICE

I hereby certify service of two copies of Plaintiff-Appellant's Principal Brief via Federal Express this 16th day of April, 2012 upon the following parties:

**Jessica R. Toplin, Esq.**[1]
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

**Patrick V. Gallagher, Jr., Esq.**
U.S. International Trade Commission
Office of the General Counsel
500 E Street, SW
Washington, DC 20436

**Joseph W. Dorn, Esq.**
King & Spalding, LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006-4706

Kristin H. Mowry
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, DC 20015
202-688-3610 (ph)
trade@mowrygrimson.com
*Counsel to Ashley Furniture Industries, Inc.*

---

[1] Service made to physical address at 1100 L Street, NW, Washington D.C. 20530.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS OF FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e) because:

This brief contains 12,953 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman typeface.

_____

Kristin H. Mowry
*Counsel to Ashley Furniture Industries, Inc.*

Dated: April 16, 2012